STATE EX REL. WARREN, Attorney General, Petitioner, v. NUSBAUM, Secretary, Department of Administration, Respondent.

*No. State 226.   Argued May 4, 1972.—Decided July 7, 1972.*
(Also reported in 198 N. W. 2d 650.)

318

For the petitioner the cause was argued by *Allan P. Hubbard,* assistant attorney general, with whom on the brief was *Robert W. Warren,* attorney general.

For the respondent there were briefs by *Charne, Glassner, Tehan, Clancy & Taitelman, S. C.,* all of Milwaukee, and oral argument by *Irvin B. Charne.*

A brief amicus curiae was filed for Americans United for Separation of Church and State, Milwaukee Chapter of Americans United, and P. O. P. S. (Preserve Our Public Schools) by *Marshall E. Fredrich* of Milwaukee, attorney, and *Franklin C. Salisbury* of Washington, D. C., of counsel.

A brief amicus curiae was filed for Marquette University by *Foley & Lardner* of Milwaukee.

A brief amicus curiae was filed for the Wisconsin State Dental Society by *Michael, Best & Friedrich* and *Frank J. Pelisek* and *John K. MacIver,* all of Milwaukee.

ROBERT W. HANSEN, J. The statute challenged authorizes and the contract establishes a contractual relationship between the state and a church-related university for the providing of dental education in the state's only dental school. Does the relationship created violate either the first amendment to the United States Constitution,[1] or art. I of the Wisconsin Constitution [2]

---

[1] Amendment I, U. S. Const., provides in part: "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof. . . ."

[2] Art. I, sec. 18, Wis. Const., provides: "The right of every man to worship Almighty God according to the dictates of his own

prohibiting state establishment of religion and state interference with free exercise of religion?

*Contract for services.*

The relationship between the state and the university, authorized by the statute and established by the contract, is that of parties to a bilateral contract. The university agrees to provide dental educational facilities and services. The state agrees to make a contribution to the cost of educating each Wisconsin resident provided dentistry education. We see nothing inappropriate in such contractual approach. The state may contract for the procurement of supplies or services required for the carrying on of its public purposes.[3] It may purchase from or even aid a religious or church-related institution in securing goods or services for a public purpose.[4] However, when it does so, the relationship existing must not invade or violate federal and state constitutional provisions relating to establishment and free exercise of religion.

In a recent United States Supreme Court case, the high court dealt with a statute that authorized the state superintendent of schools to "purchase" certain specified

conscience shall never be infringed; nor shall any man be compelled to attend, erect or support any place of worship, or to maintain any ministry, against his consent; nor shall any control of, or interference with, the rights of conscience be permitted, or any preference be given by law to any religious establishments or modes of worship; nor shall any money be drawn from the treasury for the benefit of religious societies, or religious or theological seminaries."

[3] 81 C. J. S., *States*, pp. 1084, 1085, sec. 112.

[4] "The simplistic argument that every form of financial aid to church-sponsored activity violates the Religion Clauses was rejected long ago . . . ." *Tilton v. Richardson* (1971), 403 U. S. 672, 679, 91 Sup. Ct. 2091, 29 L. Ed. 2d 790, rehearing denied, in 404 U. S. 874, 92 Sup. Ct. 25, 30 L. Ed. 2d 120.

"secular educational services" from nonpublic schools.[5] Under the "contracts" authorized by the statute, the state in that case directly reimbursed nonpublic schools for their actual expenditures for teachers' salaries, textbooks and instructional materials. The high court made no mention of anything improper in the contract approach, but proceeded to discuss and test the relationship established exactly as if it had been a grant or state financial aid provided without a contract being entered into.[6] We will do the same, beginning with the issues of applicability of the first amendment of the United States Constitution to the statute and contract.

## The first amendment.

There are numerous United States Supreme Court decisions dealing with the "establishment" and "free exercise" clauses of the first amendment. Noting the internal tension in the first amendment between the two clauses, these decisions have sought ". . . to define the boundaries of the neutral area between these two provisions within which the legislature may legitimately act." [7] We are bound by the results and interpretations given the first amendment in these high court decisions. Ours not to reason why; ours but to review and apply. That limited assignment is not made easier by apparent shifts in emphasis and differences between majority, plurality, concurring and dissenting opinions.[8] How-

[5] *Lemon v. Kurtzman* (1971), 403 U. S. 602, 609, 91 Sup. Ct. 2105, 29 L. Ed. 2d 745, rehearing denied, in 404 U. S. 876, 92 Sup. Ct. 24, 30 L. Ed. 2d 123.

[6] *Id.* at page 621.

[7] *Tilton v. Richardson, supra,* at page 677.

[8] *Id.* at page 678, the opinion noting: "There are always risks in treating criteria discussed by the Court from time to time as 'tests' in any limiting sense of that term. Constitutional adjudication does not lend itself to the absolutes of the physical sciences or mathematics. . . . [C]andor compels the acknowledgment that we can only dimly perceive the boundaries of permissible government activity in this sensitive area of constitutional adjudication."

ever, reading two decisions announced on the same day,[9] leads to the conclusion that the majority of the present court, in *Tilton*, would have us ask and answer the following four questions:

1. Does the act [the law challenged] reflect a secular legislative purpose?

2. Is the primary effect of the act to advance or inhibit religion?

3. Does the administration of the act foster an excessive governmental entanglement with religion?

4. Does the implementation of the act inhibit the free exercise of religion? [10]

We would change the order in which the questions are reached, nothing more, by analogizing the guidelines set forth to taking a ship through a harbor entrance to a dock for unloading. The trip can be made but only to a primarily secular port or destination. Two well-marked reefs mark the outer harbor entrance. One is the "establishment" clause of the first amendment. The other is the "free exercise" clause. Both must be avoided. Additionally, the ship must make the port entry, almost on automatic pilot, so that constant steering, backing and checking of the course are not needed to stay on course and off the reefs.

*Secular legislative purpose?*

Little time or space will be given to the issue of whether a contract or aid to a dental school for providing dental education serves a valid secular purpose. Not only is the legislative statement of intent to be given great weight,[11] but the very nature of dental education re-

---

[9] *Tilton v. Richardson, supra; Lemon v. Kurtzman, supra.*

[10] *Tilton v. Richardson, supra,* at page 678.

[11] *State ex rel. Warren v. Reuter* (1969), 44 Wis. 2d 201, 212, 170 N. W. 2d 790, holding: "Although this court is not bound by the declaration of public purpose contained in an act, nevertheless what constitutes a public purpose is in the first instance a question

assures as to the completely secular nature of the teaching of dentistry. There is no Catholic way to pull a tooth. Nor is there a Lutheran or Jewish or Mohammedan way to repair a tooth. Exodontists may disagree as to whether to remove or repair an aching molar, but religious beliefs have nothing to do with the difference of opinion. Likewise, the public interest in assuring the continued availability of dental education and qualified dental personnel in the state is clear. As this court has said of a private medical college, so with aiding or contracting for services with a private dental school.[12] That other colleges or schools within a university complex may not be similarly insulated against religious indoctrination does not reach, affect or permeate the entirely secular education provided by the dental school here involved. *Tilton* rejected the concept that religion so permeates the secular education provided by church-related universities that their religious and secular educational functions are in fact inseparable.[13] The dental

for the legislature to determine and its opinion should be given great weight. . . ."

[12] *Id.* at page 214, this court stating: "It cannot be seriously questioned that the health of the people of this state is of great concern and the proper object of our state government's interest. We stated over twenty-five years ago . . . 'that the promotion and protection of public health is a matter of statewide concern.'

". . . The appropriation is not primarily to benefit the Marquette School of Medicine but to promote and maintain public health." (Quoting *State ex rel. Martin v. Juneau* (1941), 238 Wis. 564, 571, 300 N. W. 187.)

[13] *Tilton v. Richardson, supra,* at pages 680, 681, the court stating: "Appellants instead rely on the argument that government may not subsidize any activities of an institution of higher learning which in some of its programs teaches religious doctrines. . . . [A]ppellants' position depends on the validity of the proposition that religion so permeates the secular education provided by church-related colleges and universities that their religious and secular educational functions are in fact inseparable. This argument that government grants would thus inevitably advance re-

school here is secular in nature, and, on this record, aiding such dental school is an entirely secular and completely valid public purpose.

### Primary effect to advance?

Now as to the twin reefs. The first such is that the primary effect of the law must not be to advance religion. If the law and the contract were limited to insuring the maintenance of a dental college and the education of Wisconsin residents in dentistry, the ship would come nowhere near the "establishment" reef. However, the contract between the university and state expressly provides that:

"The Institution [the university] agrees that all amounts received pursuant to this contract shall be used exclusively *in support of its operating costs.*" (Emphasis supplied.)

If this is read, as seems entirely reasonable, to require or permit amounts paid under the contract, not used or needed in the dental school for dental education, to be used elsewhere in the university, it runs aground on the "establishment" reef. It is no answer to contend that the needs of the dental school are so great and the state payments so partial a defrayment that, predictably, no "surplus" will exist that could or would be used to pay university operating costs other than those of the dental school. It is with the coin of possibilities, not probabilities, that we must deal.

In *Tilton,* the United States Supreme Court had before it a statute that provided if, for a twenty-year pe-

ligion . . . [was] considered by this Court in *Allen.* There the Court refused to assume that religiosity in parochial elementary and secondary schools necessarily permeates the secular education that they provide. . . .

"There is no evidence that religion seeps into the use of any of these facilities." (Referring to *Board of Education v. Allen* (1968), 392 U. S. 236, 88 Sup. Ct. 1923, 20 L. Ed. 2d 1060.)

riod, the church-related recipients of the federal construction grant violated any of the restrictions as to use of the facilities built with federal money, the government was "to recover an amount equal to the proportion of the facility's present value which the federal grant bore to its original cost." [14] This penalty provision obviously was intended to ensure that the impact of the federal aid would not advance religion. However, the high court found that limitation placed on the use of the building for twenty years was "inadequate." The possibility of religious use of the structures even if only after twenty years of use "trespassed" on the Establishment Clause. [15] Clearly, the statutory authorization of the use of state funds paid under the contract "in support of" operating costs anywhere in the university hits the "establishment" reef. A valid statute must provide that state funds paid under the contract may be used only for dental education in the dental school of the university.

### Primary effect to inhibit?

Now we turn to checking the course mapped out to see if it runs into the "free exercise" clause of the first amendment. It is to be remembered that those who sought to assure "freedom of religion" by constitutional amendment did so as much from a fear of state interference with religion as from an apprehension that one

---

[14] *Id.* at page 682.

[15] *Id.* at page 683, the court finding: "Limiting the prohibition for religious use of the structure to 20 years obviously opens the facility to use for any purpose at the end of that period. . . . If, at the end of 20 years the building is, for example, converted into a chapel or otherwise used to promote religious interests, the original federal grant will in part have the effect of advancing religion.

"To this extent the Act therefore trespasses on the Religion Clauses. . . ."

faith would be made a state-established religion. The history of this century gives no basis for finding unrealistic such fear that an all-powerful state apparatus might come to control or seek to suppress religious beliefs or institutions. In any event, it is the "free exercise" clause that goes directly to protecting religion from interference on the part of the state.

To avoid the "free exercise" reef the relationship between state and church-related university here established is not to be marked by state controls over any phase of the university's operation except that of maintaining and operating the dental school. Even the bilateral contract approach does not permit provisions in the contract university-wide in applicability.

Since the contract can be upheld as valid only if it is confined to the purely secular area of dental school operation, the contract and controls must be limited to the same circumscribed area. That is true whether they are termed contractual obligations, guidelines or standards. The proverb had it that, "He who pays the fiddler calls the tune." In this sensitive area, it cannot be permitted to develop that, "He who pays the fiddler furnishes the sheet music," at least not beyond the specific and limited area involved in the contract. Guidelines and standards too easily become halter and harness.

In the case before us, the statute requires that the university will maintain and improve standards of academic and professional excellence *in its dental school.*[16] The statute also requires that applicants for admission *to the dental school* who are residents of Wisconsin be

---

[16] The statute provides: "The contracting institution [the university] shall agree that it shall administer and operate its courses and programs in dentistry conformably to academic and professional standards, rules and requirements; and shall seek progressively to enrich and improve its courses of dental education, research and public service by full and efficient use of budgetary and other resources available to it."

accorded certain preferences.[17] The statute and contract reach further to obligate the university to establish and maintain certain hiring practices *throughout* the university and not limited to the dental school.[18] It may be a small enough camel's head thrust under the tent, because the employment policies agreed to largely follow the state statute's prohibition of discriminatory employment practices.[19] There is, however, a sharp dispute as to whether the contract would require the university to open the opportunity to be university president to others than members of the Jesuit Order.[20] We note the

[17] The statute provides: "The contracting institution [the university] shall agree that it shall maintain an admissions policy under which applicants for admission to its dental school who are residents of Wisconsin are accorded preference over other applicants having substantially equal academic qualifications and credentials."

[18] The contract provides: ". . . the Institution [the university] agrees to not discriminate against any employe, applicant for employment, or applicant for admission because of race, religion, color, national origin, or sex. The aforesaid provision shall include, but not be limited to, the following: employment, upgrading, demotion or transfer; recruitment or recruitment advertising; layoff or termination; rates of pay or other forms of compensation; and selection for training, including apprenticeship. The Institution agrees to post in conspicuous places available for employes, applicants for employment and applicants for admission, notices to be provided by the Board [the State Higher Educational Aids Board] setting forth the provisions of the nondiscrimination clause."

The statute provides: ". . . In addition, the contracting institution shall agree that the nondiscrimination provisions of s. 16.765 which prohibit discrimination apply and are expanded to include ,discrimination on account of sex. . . ."

[19] Sec. 16.765 (1), Stats., requires that: "Contracting agencies of the state shall include in all contracts executed by them a provision obligating the contractor not to discriminate against any employe or applicant for employment because of race, religion, color or national origin."

[20] It appears that the by-laws of Marquette University require it to hire only members of the Society of Jesus, a religious order of the Roman Catholic Church, as president and vice-president of the university.

disagreement, not to decide it, but to make the point that the contract for providing dental education may not include provisions related to and governing the operation of other parts of the university structure. What is outside the dental school is outside the contract. That is true as to funds, and as to controls.

Both the statute and the contract collide with the "free exercise" reef. The applicability of the nondiscrimination statute to church-related institutions is not at issue here. What is involved is that a statute for the purchase from a university of dental education at its dental school may not impose university-wide controls or regulations. A valid statute would permit only contract provisions related and limited to the providing of dental education in the dental school of the university.

*Excessive entanglements?*

Finally, we consider whether excessive entanglements characterize the relationship created between state and church-related university under this law. It ought to be made clear, as *Lemon* and *Tilton* do make clear, that "entanglement," as used here, is not a matter of those accounting reports or budgetary controls, but rather surveillance to make sure that religion is not intermixed with the purpose served by state aid.[21] Some audit-type protection against fiscal misdirection of funds can accompany any contract or grant even in this sensitive area. If not, the result in *Tilton* would have been different, as well as in cases validating grants of public

---

[21] *Lemon v. Kurtzman, supra,* at page 619, the court stating: "We do not assume, however, that parochial school teachers will be unsuccessful in their attempts to segregate their religious beliefs from their secular educational responsibilities. But the potential for impermissible fostering of religion is present. . . .

"A comprehensive, discriminating, and continuing state surveillance will inevitably be required to ensure that these restrictions are obeyed and the First Amendment otherwise respected. . . . These prophylactic contacts will involve excessive and enduring entanglement between state and church."

funds to hospitals, clinics, orphanages, etc., for specific purposes.[22]

What is meant by "excessive entanglement" is, in the words of *Tilton*, ". . . governmental surveillance . . . required to guarantee that state salary aid would not in fact subsidize religious instruction."[23] What we are dealing with is ". . . the risk that government aid will in fact serve to support religious activities. . . ."[24] *Tilton* listed facts and factors that reduced such risk in that case. The *Tilton* opinion concluded that, cumulatively, weighed together they shaped a "narrow and limited relationship with government" and, as a result, there was "less potential for realizing the substantive evils against which the Religion Clauses were intended to protect."[25]

The aiding of dental education in a dental school, with all funds limited to such endeavor in such school setting, appears to us to be as well insulated against the need for "government surveillance" to make sure that religion is not aided as were the four one-time, single-purpose construction grants involved in *Tilton*. There the government provided facilities that were themselves religiously neutral. Here the state aids a dental school that is, by any test, completely secular in purpose and operation. The nature of the school and its courses for dental students requires no continuing surveillance to ". . . guarantee that state . . . aid would not in fact subsidize religious instruction. . . ."[26] The distinct and separable character of dental education in a dental school

---

[22] *See: Horace Mann League v. Board of Public Works* (1966), 242 Md. 645, 220 Atl. 2d 51, certiorari denied, 385 U. S. 97, 87 Sup. Ct. 317, 17 L. Ed. 2d 195; *Truitt v. Board of Public Works* (1966), 243 Md. 375, 221 Atl. 2d 370; *Schade v. Allegheny County Institution Dist.* (1956), 386 Pa. 507, 126 Atl. 2d 911; *Community Council v. Jordan* (1967), 102 Ariz. 448, 432 Pac. 2d 460.

[23] *Tilton v. Richardson, supra,* at page 688.

[24] *Id.* at page 687.

[25] *Id.* at page 688.

[26] *Id.* at page 688.

has a built-in safeguard against religious instruction entering the picture. As was said in *Tilton,* the ". . . entanglement between church and state is also lessened here by the nonideological character of the aid that the government provides. . . ." [27] Here, as in *Tilton,* it can be confidently asserted that:

". . . the necessity for intensive government surveillance is diminished and the resulting entanglements between government and religion lessened. Such inspection as may be necessary to ascertain that the facilities are devoted to secular education is minimal and indeed hardly more than the inspections that States impose over all private schools within the reach of compulsory education laws." [28]

The relationship here created requires no state pilot to get on board and stay there to insure that only secular purposes will be served by a contract for dental education. No religious instruction is involved in the operation of the dental school. No courses of a religious nature are required for admission to or graduation from the dental school. However, since even future possibilities of changed policies and resultant "entanglement" ought be insured against, we see wisdom in including in a valid statute for purchase of dental education from a church-related university an express provision that no course in religion may be required for admission to or graduation from such dental school. It is noted that, in *Tilton,* the high court dealt with an Act of Congress in which a number of detailed provisions were set forth to protect against use of public funds for religious purposes. Length in statutory enactments is not necessarily a virtue, but it is a high-risk undertaking to leave constitutional requirements and limits unexpressed in an enabling act, relying upon an administrative agency to locate and stay within the authority delegated. We

[27] *Id.* at page 687.
[28] *Id.* at page 687.

would not hold the statute unconstitutional on this failure to spell out that courses in religion are not to be required in the dental school curriculum. However, to be insulated against attack on this score, a valid statute ought include a specific assurance that religious instruction is not required—and not to be required—as a part of dental education, either for admission to the dental school or graduation from it.

We note that certain courses, arguably of a religious nature, are required at the university of those studying to be dental hygienists. While the statute and contract here relate solely to the education of dentists in dentistry, it would appear advisable that the statute require and the contract provide that neither dental students, nor those studying dental hygiene, be required to take religious instruction or courses of a religious nature as a prerequisite to their undertaking or completing their education as dentists or dental hygienists. Even the peripheral matter of the training of dental hygienists ought to be brought into line with the completely secular policies established and maintained for the admission and graduation of dentistry students in order to make clear the entirely secular nature of all aspects of the dental school operation.

*State constitution.*

The challenge here is to the constitutionality of the statute both under the first amendment and art. I, sec. 18, Wisconsin Constitution.[29] While words used may differ, both the federal and state constitutional provisions relating to freedom of religion are intended and operate to serve the same dual purpose of prohibiting the "establishment" of religion and protecting the "free exercise" of religion. So our holding that the statute involved violates the first amendment is a holding that, in

[29] *See* fn. 1 and fn. 2 at page 3.

these particulars, it also violated art. I, sec. 18, Wisconsin Constitution.

Additionally, however, the state constitution has this language: ". . . nor shall any money be drawn from the treasury *for the benefit of* religious societies, or religious or theological seminaries." (Emphasis supplied.) Do payments on the contract for state purchase of dental education from a church-related university constitute money drawn from the treasury "for the benefit of" a religious society or religious or theological seminary? A dental school or college, operating as a unit of a university, may be sufficiently separate in terms of finances, controls and secular nature of its educational programs as to permit state aid. "For the benefit of" is not to be read as requiring that some shadow of incidental benefit to a church-related institution brings a state grant or contract to purchase within the prohibition of the section. This court has held that ". . . we cannot read sec. 18 [of art. I, Wisconsin Constitution] as being so prohibitive as not to encompass the primary-effect test. . . ." [30] The applicability of the primary-effect test is to make "The crucial question . . . not whether some benefit accrues to a religious institution as a consequence of the legislative program, but whether its principal or primary effect advances religion." [31] It is the primary effect of moneys going from the state treasury to a religious society or church-related institution that determines if such payment is "for the benefit of" such society. In the medical college case, this court held: ". . . In the case before us, the primary effect of the legislation is not the advancement of religion but the advancement of the health of Wisconsin residents." [32] Payments under a proper contract for

[30] *State ex rel. Warren v. Reuter, supra,* at page 227.

[31] *Tilton v. Richardson, supra,* at page 679.

[32] *State ex rel. Warren v. Reuter, supra,* at page 227.

providing dental education by a church-related university need not be payments "for the benefit of" a religious society or such church-related institution but can be payments for the advancement of the dental health of the citizens of this state. Art. I, sec. 18 of the state constitution would not be violated by a proper statute, a proper contract, or payments made pursuant to such contract and statute.

On the corollary point of whether the university here is to be considered as one of the "religious or theological seminaries" in this state, we agree that the university, in all of its operations, cannot be considered as a completely secular institution. However, *Tilton* lessens the reach of earlier decisions of this court [33] insofar as the first amendment is concerned, and we accept that decision as entirely persuasive, even if not controlling, in establishing a difference based on function between various aspects of the university operation. For *Tilton* clearly holds that a church-related university may, in some of its operations, be carrying on an entirely secular function, even though as to others it may be devoted to and carrying on a religious or theological function.[34] In the operation of its dental school, the university here is carrying on a secular function, and, with purpose, funds and controls of a state grant or purchase agreement limited to such dental school, the field of religion or

[33] *See: State ex rel. Weiss v. District Board* (1890), 76 Wis. 177, 215, 44 N. W. 967; *State ex rel. Reynolds v. Nusbaum* (1962), 17 Wis. 2d 148, 156, 115 N. W. 2d 761; *State ex rel. Warren v. Reuter, supra.*

[34] *See:* fn. 13, *supra.* Also, in *Tilton,* the court notes that:

"The Act itself was carefully drafted to ensure that the federally subsidized facilities would be devoted to the secular and not the religious function of the recipient institutions. It authorizes grants and loans only for academic facilities that will be used for defined secular purposes and expressly prohibits their use for religious instruction, training, or worship. . . ." (*Tilton v. Richardson, supra,* at pages 679, 680.)

theology is not invaded. A dental school or college, while an integral part of a university, is separable by its specific function and reason for being from other phases of the university operation. It is true that in ruling valid the granting of state aids to the Marquette University Medical School, the divorcement of the medical school from university ownership and control was stressed. The court there was presented with a situation in which the university elected to separate itself from the operation of its medical college. The medical school case is not to be read as requiring such cutting of the ties between university and college as a prerequisite to a valid state contract or grant to a university for the carrying on of a completely secular function.

The medical college case was pre-*Tilton*. In *Tilton*, the United States Supreme Court upheld an Act of Congress authorizing federal-aid construction grants to church-related colleges and universities. The five grants challenged were to church-related colleges and universities for the building of a science building—a music, drama and arts building—a language laboratory—and two university libraries. The court held the grants constitutional despite the fact that there was no effort or claim of separating control or operation of the buildings from the universities involved.[35] It was enough, the United States Supreme Court held, that "There is no evidence that religion seeps into the use of any of these facilities." [36] Our holding that there is no involvement of religion in the providing of dental education at the dental school of the university here fits the *Tilton* test. It is the function served, not the matter of ownership or control, that governs. No decree of absolute divorce or even legal separation is, under *Tilton*, required.

[35] *Tilton v. Richardson, supra,* at page 681.
[36] *Id.* at page 681.

*Statute unconstitutional.*

In reviewing ch. 44, Laws of 1971, creating sec. 39.36, Stats., and applying the tests required by the first amendment and art. I, sec. 18, Wisconsin Constitution, we conclude and find:

(1) The statute, authorizing the contracting for purchase of dental education by the university dental school, served a completely secular and entirely valid public purpose.

(2) The statute violates the "establishment" clause of the first amendment by permitting the use of funds paid under the contract "in support of the operating costs" of the university and not limiting the use of such funds exclusively to the providing of dental education in the dental school of the university.

(3) The statute violates the "free exercise" clause of the first amendment by requiring regulations as to hiring and management policies of the university, and not limiting such controls to the operation of the dental school in providing dental education.

(4) A valid statute for the purchase of dental education from the dental school of a church-related university is required to provide that no religious instruction is required for admission to or graduation from such dental school. In no other aspect does the statute necessarily involve or require such "excessive entanglement" or continuing surveillance as would violate first amendment requirements.

(5) A valid statute for the purchase of dental education from the dental school of a church-related university is required to permit payments only to the dental school if it is to avoid the Wisconsin constitutional prohibition on payments from the treasury "for the benefit of religious societies, or religious or theological seminaries."

We conclude, as very nearly we began, by analogizing the undertaking here to the voyage of an ocean vessel. The ship was headed for a proper destination but it ran into a couple of reefs on its way into the harbor entrance. More carefully charted, the trip can be made, but it is for the legislature, not the courts, to determine whether it is to be made.

*By the Court.*—Ch. 44 of the Laws of 1971, creating sec. 39.36, Stats., is declared to be unconstitutional. Respondent is ordered not to make any payments on the contract entered into pursuant to that statute. In view of the possible imminence of a special legislative session, motions for rehearing will not be entertained.

HALLOWS, C. J. *(dissenting)*. As I read *Lemon v. Kurtzman* (1971), 403 U. S. 602, 91 Sup. Ct. 2105, 29 L. Ed. 2d 745, it does not require, as the majority opinion does, that a contract between the state and a private school to purchase educational services must be treated as a grant of aid to the school. In *Lemon* under the contracts authorized by the Pennsylvania statute, the state directly reimbursed nonpublic schools solely for actual expenditures for teachers' salaries, textbooks, and instructional material relating to secular subjects and prescribed accounting procedures which identified the "separate" cost of the "secular educational system." The superintendent of public instruction was required to approve the textbooks and instructional materials. The court held the aid involved an excessive entanglement between state and religion. A fair reading of the contract in *Lemon* disclosed it was not a purchase of non-sectarian subjects but a reimbursement for certain expenditures and in effect an aid. The contract in the instant case between the Wisconsin higher educational aids board and Marquette University involves the pur-

chase of total dental educational services for Wisconsin residents at a price of $3,500 per student. There is no reason to believe the legislature did not mean what it said by "purchase." The legislature, of course, cannot call black "white," but in this case it called a spade a "spade," which it can do.

As the majority opinion notes, a state may purchase services needed for the public good from any source and it is immaterial whether the supplier of those services is an individual, a corporation, a Christian or an atheist. If the purchase price is right, it is of no moment constitutionally what the supplier of the services does with the money. Even direct grants to church-sponsored activity do not necessarily violate the religious clauses of the constitution. Construction grants, bus transportation, textbooks, and tax exemptions give some aid to religious bodies and yet all these forms of governmental assistance have been upheld. *See Everson v. Board of Education* (1947), 330 U. S. 1, 67 Sup. Ct. 504, 91 L. Ed. 711; *Board of Education v. Allen* (1968), 392 U. S. 236, 88 Sup. Ct. 1923, 20 L. Ed. 2d 1060; *Walz v. Tax Commission* (1970), 397 U. S. 664, 90 Sup. Ct. 1409, 25 L. Ed. 2d 697; *Bradfield v. Roberts* (1899), 175 U. S. 291, 20 Sup. Ct. 121, 44 L. Ed. 168.

No great controversy exists over the fact the public health in Wisconsin demands increased dental care, which can only be adequately met by a school of dentistry in Wisconsin. The national average ratio of dentists to population is one dentist to each 2,000 persons. Wisconsin's average is one dentist to each 2,037 persons. There are 20 counties in Wisconsin with a ratio ranging from one dentist per 3,300 people to one per 11,450 people. Over the past ten years the actual number of dentists practicing full-time in this state has decreased from 2,202 in 1960 to 1,941 in 1970, and during this time the needs for dental care have substantially increased. Eighty-five percent of Wisconsin's

dentists in active practice are graduates of Marquette School of Dentistry, which is the only institution providing dental education in this state. In 1970, 118 Wisconsin young men and women were enrolled as first-year dental students in the United States. Of these, 105 or approximately 90 percent were enrolled in Marquette School of Dentistry. This school is in danger of losing its accreditation by the Council on Dental Education of the American Dental Association. Its future accreditation is dependent upon its progress in meeting 29 specific recommendations, chief among which is an adequate operating budget to provide the level of dental education which the council deemed appropriate. Part of the difficulty is the lack of a full-time faculty. In order to meet the recommended educational level, the annual cost of educating a dental student should reach $9,000. This cost is met only partly now by: (1) Tuition, which seldom in any school of higher education equals the complete cost of the educational service, and (2) income from outside sources including federal grants.

The contract with Marquette University provides the state will pay $3,500 for each resident Wisconsin student. So the state will receive the *quid pro quo* in dental education so necessary for public health, Marquette University agrees to use, and must use, this money for operating expenses so it can meet the demands of the council on dental education and continue to have its graduates recognized as accredited dentists. The majority opinion points out there is no express requirement that Marquette University use this money for the operation of the dental school. I think this is an unreasonable reading of the contract and the intent of the parties and intimates that both the state and Marquette University have purposes in mind other than that stated in the statutes and in the contract. The purpose and effect of the statute is not different than the medical health purpose this court approved in *State ex rel. Warren v.*

*Reuter* (1969), 44 Wis. 2d 201, 170 N. W. 2d 790. Consequently, there can be no question the education of a sufficient number of dentists to provide required dental-health-care needs for Wisconsin citizens is an expenditure of Wisconsin funds for a valid public purpose. I think the contract of purchase is a legitimate and valid way to secure this public purpose and applying the test of aid to these facts is inappropriate and unnecessary.

It is argued the contract has some provisions which are inconsistent with the purchase theory such as requiring the purchase money to be used for operating expenses. This provision is superfluous and was added as an extra precaution that none of the money would be used for capital improvements. This is a condition of the purchase and does not change the nature of the contract. It is also argued there is a provision required by sec. 16.765 (1), Stats., against discrimination in employment and this is violated. Such argument is not germane to the concept of purchase. The clause against discrimination is only another condition of purchase. Such condition has not been breached and affords no basis for declaring the contract void. Every contract is capable of being breached, but that possibility is not a basis of invalidity. A fair reading of the contract would restrict the requirement of this condition to the dental school which has a separate academic entity, if not a separate legal corporate entity.

Assuming, as the majority does that the law provides an aid to a private school or that the statute and the contract must meet the same constitutional requirements as a direct grant of funds must, I still have difficulty with the strictness and the literal requirements of the majority's opinion. The opinion properly states that the primary effect of sec. 39.36, Stats., created by ch. 44, sec. 4, Laws of 1971, and of the contract for the purchase of dental educational services is to improve dental

education and dental care in the state of Wisconsin and that the principal and primary effect does not advance religion. *See Tilton v. Richardson* (1971), 403 U. S. 672, 91 Sup. Ct. 2091, 29 L. Ed. 2d 790; *State ex rel. La Follette v. Reuter* (1967), 33 Wis. 2d 384, 147 N. W. 2d 304. But, I find no continuing relationship between the state of Wisconsin and Marquette University which will result in an excessive involvement or entanglement between the state and religion even assuming Marquette University is a sectarian institution. The state need only find two conditions to be assured the dental education program was being properly conducted so that it receives its *quid pro quo* for its money. This information can be secured from sources other than Marquette University. First, the state needs to know the number of Wisconsin residents enrolled each year as full-time undergraduate students in dentistry. The state must also be satisfied that Marquette University's manner of operating the school of dentistry is approved and the school is accredited by the Council on Dental Education of the American Dental Association and by the State Board of Dental Examiners. Neither of these requirements necessitate any great involvement of the state in the operation of the dental school. There is no danger to any degree that religion will creep into the training of a dentist. But, to eliminate some surveillance seemingly required by the constitution in this respect, the statute requires the curriculum of the school of dentistry shall not contain courses on religious instruction. This requirement is a supercaution because the dental school does not have courses in religion for its dental students. The majority opinion quite properly points out there is no religious way of practicing dentistry.

There is considerable doubt in my mind whether Marquette University is a sectarian or religious institution in the context of the first amendment to the United

States Constitution or art. I, sec. 18 of the Wisconsin Constitution. But this issue need not be decided because it has been held time and again that a religious institution may receive some benefit from a public grant without violating the constitution. *See Board of Education v. Allen, supra.*

I find no excessive entanglement of the present contract. The majority opinion would add more safeguards to be sure the money paid Marquette University would not be used for religious purposes; these are not needed but, if added to the statute, should not be accompanied by excessive controls.

I am not so much worried about religion influencing the state as I am that the state will influence religion through controls. If public health is not a sufficient goal, certainly education is. At the time the federal constitution was adopted there were no public schools. Education was fostered and nurtured by private institutions. Today, private education is on the brink of extinction because of lack of finances. Private industry in Wisconsin for some years has made contributions to private educational institutions and so, too, has the federal government made grants to private institutions in one form or another. It will be a sad day in America when the only education available is found in public schools controlled by the government. Private education, like private enterprise and free press, has been and must remain basic to our way of life—helped and protected by the government but not dominated thereby.

In this case, I do not find there exists any of the three functions, sponsorship, financial support, and active involvement in religion, sought to be avoided by the establishment clause of the constitution. *Walz v. Tax Commission, supra; Lemon v. Kurtzman, supra.* The three tests of *Lemon* have been met, *i.e.*, the state must have no secular purpose, the primary effect must

neither advance nor inhibit religion, and there must not be excessive entanglement.

In this day of ecumenical spirit, we should have more trust and appreciation for our fellowmen and their religious beliefs and their differences. The present law and contract are the product of our age and in the ecumenical spirit, which recognizes a public purpose may be attained through implementation by dealing with a private school to furnish the educational services the state badly needs and does not furnish. Rather than require excessive governmental surveillance to close an air-tight door to every conceivable possibility or risk that government aid will serve to support religious activities, I would take a more reasonable and practical view of the relationship created by the statute and the contract which were born in mutual trust and respect.