ED JACKAMONIS, Chairman Assembly Committee on Organization
On behalf of the Assembly Committee on Organization you have requested my opinion on the constitutionality of 1979 Assembly Bill 227, which deals with the purchase and loan of textbooks to pupils attending public and private schools.
The Legislative Reference Bureau's analysis of 1979 AB 227 summarizes the current state of the law as permitting "each individual school board [to] purchase textbooks for the public schools in the district and sell them to the pupils at cost." The Bureau goes on to state the substance of 1979 AB 227 to be a requirement that "school boards . . . loan textbooks to all requesting pupils attending a public or private school located within the school district." The bill states that "[e]ach school district shall be paid state aid for the purchase of textbooks at the rate of $20 per school year per pupil for whom textbooks are purchased and to whom textbooks are actually loaned." See sec.118.03 (3) (b), Stats., as recreated by 1979 AB 227. By statutory definition, though, only schools at the elementary and high school levels are affected. See sec. 118.03 (1) (a), Stats., as recreated by 1979 AB 227; secs. 121.51 (3) and 115.01 (1), Stats. The bill also contains several other qualifications: (1) a student is ineligible under the program if he attends a private school that does not comply with Title VI of the Civil Rights Act of 1964, which prohibits discrimination on the basis of race, color, or national origin under any program *Page 288 
that receives federal financial assistance; (2) loans are to be made only upon the request of the pupil or his parent or guardian; (3) a textbook may not be purchased or loaned unless it is accurate, nondefamatory of this nation's founders, and nonsectarian; and (4) all textbooks purchased and loaned must be used as principal study aids by the pupil's school for at least five years. In addition, the bill directs the state Superintendent to promulgate rules to administer the textbook purchase and loan program.
The fiscal estimate prepared by the Wisconsin Department of Public Instruction is printed as an appendix to 1979 AB 227, and it states in part:
 Local school districts would develop plans to purchase 20% of their needed textbooks each year with the life span of textbooks expected to be five years.
 The definition of text books [sic.] in this proposal includes workbooks which are expendable and would need to be purchased annually.
From a constitutional point of view, the significant change that this bill would make in the law is that school boards would be required to purchase textbooks and, upon the request of pupils or their parents or guardians, loan the textbooks, without charge, to all pupils attending public or private schools within the school district. See sec. 118.03 (2)(b), Stats., as recreated by 1979 AB 227.
The constitutional question is whether a statute resulting from this bill would be unconstitutional under the establishment of religion clause of the First Amendment of the United States Constitution or under the similar but somewhat more restrictive provisions of Wis. Const. art. 1, sec. 18.
I. Analysis under the United States Constitution
The leading recent case decided by the United States Supreme Court on this matter is Wolman v. Walter, 433 U.S. 229 (1977). That case involved a challenge, under the first amendment's establishment of religion clause, of an Ohio statute substantially similar in part to the provisions of 1979 AB 227. The Ohio statute authorized, inter alia, the expenditure of public funds to purchase secular textbooks approved by the Superintendent of Public Instruction for use in *Page 289 
the public schools and to loan such textbooks to public and nonpublic school pupils or their parents.[1] The Ohio statute also had other provisions that were challenged, provisions dealing with additional services and supplies to be furnished from public funds for nonpublic school students. A district court held that the statute was constitutional in all respects. Wolmanv. Essex, 417 F. Supp. 1113 (S.D. Ohio, E.D. 1976). On direct appeal the United States Supreme Court in a partial affirmance upheld the textbook loan provisions by a vote of six to three. The fragmented Court took the following actions on the other types of aid provided in the Ohio scheme: (1) upheld, six to three, the expenditure of funds for distributing and scoring standardized educational tests; (2) upheld, eight to one, the provision of services performed at the school site by state personnel diagnosing certain health and educational problems; (3) upheld, seven to two, the rendering of services at nonschool sites by state personnel giving therapy for health and educational problems; (4) held invalid, seven to two, the loans to students of equipment and instructional materials, such as maps and projectors; and (5) held invalid, five to four, the expenditure of funds for commercial transportation or the use of school vehicles for field trips.
The textbook loan program involved in the Wolman case is similar in all significant respects to that envisioned for Wisconsin, and the language used in 1979 AB 227 bears a striking resemblance to the statutory language approved by the Court inWolman. In the Ohio scheme, textbooks and book substitutes loaned under Ohio Rev. Code Ann. sec. 3317.06 (A) were: *Page 290 
 [L]imited to books, reusable workbooks, or manuals, whether bound or in looseleaf form, intended for use as a principal source of study material for a given class or group of students, a copy of which is expected to be available for the individual use of each pupil in such class or group.
Wolman, 433 U.S. at 237. Similarly, section 4 of 1979 AB 227 repeals and recreates sec. 118.03, Stats., so that sec. 118.03
(1)(c), Stats., will provide that "`[t]extbook' means a book, workbook or manual, intended as a principal source of study material for a semester or more in a particular class." Also, section 4 of the bill, in recreating sec. 118.03 (2), Stats., adds a prohibition that "[n]o textbook may be designated for use or be used in any public school [if the textbook] . . . is devoted to, prejudiced in favor of, or promotes the interests of, any religious denomination." This parallels the qualification in Ohio Rev. Code Ann. sec. 331 7.06 (A) that fund expenditures be only for the purchase of "secular textbooks as have been approved by the superintendent of public instruction for use in public schools."
The Ohio textbook loan program, to which 1979 AB 227 appears so similar, bore, the Supreme Court commented in Wolman, a striking resemblance to the systems upheld in Board of Education v. Allen,392 U.S. 236 (1968) and Meek v. Pittenger, 421 U.S. 349 (1975). The Court noted at 238 that the only distinction between the Ohio statute and those in Allen and Meek offered by the Wolman
appellants was that the Ohio statute defined "textbook" as "any book or book substitute." Because the Ohio statute, unlike those in Allen or Meek and unlike the bill in the instant matter referred to "book substitute[s]," the Wolman appellants had argued that auxiliary equipment and materials might be loaned under this language, resulting in an unconstitutional loan. Although the Court agreed that loans of auxiliary equipment and materials were unconstitutional, it rejected this constitutional challenge to textbook loans. It found the appellants' argument "untenable in light of the [Ohio] statute's separate treatment of instructional materials and equipment in its subsections (B) and (C), [which were distinct from the subsection dealing with textbooks], and in light of the stipulation defining textbooks as `limited to books, reusable workbooks, or manuals.'"433 U.S. at 238. The Wolman definition is nearly identical to the definition of "textbook" in 1979 AB 227. After also rejecting the Wolman
appellants' claim that the "textbook substitute" language was so vague as *Page 291 
to be open to sectarian abuse of the loan program, the Court concluded that the Ohio textbook loan program, like those inAllen and Meek was constitutional. The Court declined to overrule those two cases.
In fact, despite the division among the Justices in the area of school aid under the establishment clause, the constitutionality of textbook loan programs is one issue to which the Supreme Court's answer has remained constant. At the time that textbook loans were upheld in Allen, a majority of the Court refused to assume that parochial schools were permeated with religion to the point that even secular subjects could not be taught without a religious bias. Taken in conjunction with the local school board's assurance that only secular books would be used, this lack of judicial suspicion of parochial school bias was a major basis for the Allen Court's holding of constitutionality. Allen,392 U.S. at 245-48. In Allen, the Court noted its view that many informed persons, among them legislators, believed that private schools, including parochial schools, adequately provided secular education to their students. The Court in Allen, 392 U.S. at 248, stated that:
 This judgment is further evidence that parochial schools are performing, in addition to their sectarian function, the task of secular education. . . . [W]e cannot agree . . . that the processes of secular and religious training are so intertwined that secular textbooks furnished to students by the public are in fact instrumental in the teaching of religion.
The Supreme Court no longer holds this view of the operation of parochial schools. In deciding Wolman, for example, the Court expressed its belief that secular education in parochial schools could not be separated from the inculcation of religious beliefs because this inculcation was the purpose of such schools. Wolman,433 U.S. at 249-50, quoting Meek, 421 U.S. at 366. The Wolman
Court added that "[i]n more recent cases, [than Allen] [the Justices] have declined to extend that presumption of neutrality to other items in the lower school setting." Wolman,433 U.S. at 252 n. 18. See also, State ex tel. Wis. Health Fac. Auth. v.Lindner, 91 Wis.2d 145, 156-59, 280 N.W.2d 773 (1979). When urged to extend the Allen presumption to all materials similar to textbooks, the Court has refused, opting instead for "continued adherence to the principles announced in [its] subsequent cases."Id. Nonetheless — and of importance to the *Page 292 
instant matter involving 1979 AB 227 — in the narrow area of textbook loans, "Board of Education v. Allen has remained law, and [the Supreme Court] now follow [s] as a matter of stare decisis the principle that restriction of textbooks to those provided the public schools is sufficient to ensure that the books will not be used for religious purposes." Id.
In reaching its conclusion in Wolman, that statutory safeguards there sufficiently counteracted the parochial schools' religious permeation, the Court used the three-part test that had emerged from its earlier decisions, such as Lemon v. Kurtzman, 403 U.S. 602
(1971). This test, which has also been applied on numerous occasions by the Wisconsin Supreme Court and to which I referred in a recent opinion, 67 Op. Att'y Gen. 283 (1978), can be stated as follows: (1) the state program must have a purpose that is secular in nature; (2) the program may not have a principal or primary effect of advancing or inhibiting religion or religious practices; and (3) the state program must not foster excessive entanglement between church and state. Regarding the third prong of the test, the Court in Lemon pointed out that three factors should be examined in testing for entanglement: (1) the recipient institution's character and purpose; (2) the nature of the aid; and (3) the relationship between government and religious authorities in which the program resulted.
As already indicated, the textbook loan program challenged inWolman was upheld under the purpose — effect — entanglement test. The first prong was easily met on the ground that the statute, which at Ohio Rev. Code Ann. sec. 3317.06
explicitly prohibited provision of "services, materials, or equipment for use in religious courses, devotional exercises, religious training, or any other religious activity," merely "reflect [ed] Ohio's legitimate interest in protecting the health of its youth and in providing a fertile educational environment for all the schoolchildren of the State." Wolman,433 U.S. at 236. The Court's reliance on the precedential value of Allen andMeek took the place of an extended analysis of the effect and entanglement elements.
On the basis of the case law, it now seems clear, especially after Wolman, that textbook loan programs such as envisioned in 1979 AB 227 do not violate the establishment clause. Textbook programs continue to be treated more favorably than programs involving other types of aid. For example, as mentioned earlier in this opinion, the *Page 293 
Court in Wolman struck down as an advancement of religion the part of a loan program involving allegedly nonideological study aids such as tape recorders, globes, maps, projectors, and so forth. In Lemon the Court concluded that impermissible entanglement was involved in programs by which salary supplements were made to teachers of secular subjects in private schools where per-pupil spending was lower than at public schools. TheLemon Court also found impermissible entanglement present in programs by which nonpublic schools were reimbursed for a portion of the cost of teacher salaries and study materials in secular subjects. Thus, as these cases illustrate, although the secular purpose element of the establishment clause test rarely, if ever, provides a constitutional stumbling block in the school aid cases, the religious effect and entanglement elements do frequently result in programs being struck down. Nonetheless, as stated earlier, textbook loan programs have consistently been upheld, on the basis of Allen. There is no evidence that the Supreme Court will not continue to uphold them.
II. Analysis under the Wisconsin Constitution
The Wisconsin Supreme Court has stated that the establishment clause of the First Amendment of the United States Constitution "lends itself to more flexibility of interpretation" than does Wis. Const. art. 1, sec. 18.[2] State ex rel. Reynolds v.Nusbaum, 17 Wis.2d 148, 165, 115 N.W.2d 761, 770 (1962). This is so because "[t]he freedom of worship section of our state constitution . . . includes language more specific than the terser establishment of religion and free exercise . . . clauses in the first amendment of the federal constitution." State exrel. Holt v. Thompson, 66 Wis.2d 659, 676, 225 N.W.2d 678, 687
(1975). *Page 294 
The Wisconsin Supreme Court in State ex rel. Warren v. Nusbaum,55 Wis.2d 316, 198 N.W.2d 650 (1972), discussed the proper judicial approach in ruling on a nonpublic school aid program already held constitutional under the first amendment. First it noted that "[w]hile the words used may differ, both the federal and state constitutional provisions relating to freedom of religion are intended and operate to serve the same dual purpose of prohibiting the `establishment' of religion and protecting the `free exercise' of religion." Id. at 332, 198 N.W.2d at 658. The court then noted that appearing after the Wis. Const. art. 1, sec. 18, language resembling a detailed version of thefirst amendment, is additional language specifically prohibiting the expenditure of any public funds "for the benefit of religious societies, or religious or theological seminaries." The court concluded that this was the important language for it to examine in determining the constitutionality under Wis. Const. art. I, sec. 18, of a program that has already been found constitutional under the first amendment: it reasoned that the earlier language in Wis. Const. art 1, sec. 18, need not be examined if the court has already found the statutory program to be constitutional under the first amendment, since the federal amendment and the free worship language that appears before the spending prohibition in the state constitutional passage serve the same purpose. Id. at 332-33, 198 N.W.2d at 658-59. In reviewing the statutory scheme for constitutionality under the Federal Constitution, the state court is to apply the United States Supreme Court's purpose effect — entanglement test: "We [in the state judiciary] are bound by the results and interpretations given the first amendment in these high court decisions. Ours [is] not to reason why; ours [is] but to review and apply." Id. at 322, 198 N.W.2d at 653. Finally, with respect to examining a statutory scheme under the additional Wisconsin constitutional language prohibiting certain public expenditures, the court inState ex rel. Warren v. Nusbaum stated that the Wisconsin Supreme Court has read this spending passage as encompassing the effect element of the three-pronged test established by the United States Supreme Court for determining constitutionality under thefirst amendment.
Thus, given the just-outlined analytical approach employed by the Wisconsin Supreme Court and given the absence here of federal constitutional problems, the determinative question in the instant matter becomes whether a textbook purchase and loan statute resulting from 1979 AB 227 would violate that portion of the Wis. Const. art. 1, sec. *Page 295 18, that reads "nor shall any money be drawn from the treasury for the benefit of religious societies, or religious or theological seminaries."
As noted at the beginning of Part II of this opinion, the Wisconsin Supreme Court views the detailed language of Wis. Const. art. I, sec. 18, as amenable to less flexible interpretation than the first amendment. Nonetheless, the court has also indicated that the public spending prohibition in the state constitution is not totally prohibitive. Id. at 333,198 N.W.2d at 659, reaffirmed on this point in State ex rel. Warrenv. Nusbaum, 64 Wis.2d 314, 219 N.W.2d 577 (1974). Consequently, various types of public aid to nonpublic schools have been held not to violate the spending prohibition of Wis. Const. art. I, sec. 18.
For example, in State ex rel. Warren v. Nusbaum,55 Wis.2d 316, 198 N.W.2d 650 (1972), the Wisconsin Supreme Court stated in dicta that although a statute that directed the state to contract with a church-related university for the purchase of dental education for state residents violated the first amendment and also the free worship language of Wis. Const. art. I, sec. 18, it was valid under the latter's spending prohibition. In analyzing the language "nor shall any money be drawn from the treasury for the benefit of religious societies, or religious or theological seminaries," the court emphasized the words "for the benefit of." It posed the issue under the state constitution as follows: "Do payments on the contract for state purchase of dental education from a church-related university constitute money drawn from the treasury `for the benefit of' a religious society or religious or theological seminary"? The court then answered that question as follows:
 A dental school or college, operating as a unit of a university, may be sufficiently separate in terms of finances, controls and secular nature of its educational programs as to permit state aid. "For the benefit of" is not to be read as requiring that some shadow of incidental benefit to a church-related institution brings a state grant or contract to purchase within the prohibition of the section. This court has held that ". . . we cannot read sec. 18
[of art. 1, Wisconsin Constitution] as being so prohibitive as not to encompass the [United States Supreme Court's] primary-effect test. . . ." The applicability of the primary-effect *Page 296 
test is to make "[t]he crucial question . . . not whether some benefit accrues to a religious institution as a consequence of the legislative program, but whether its principal or primary effect advances religion."
State ex rel. Warren v. Nusbaum, 55 Wis.2d 316, 333,198 N.W.2d 650, 659 (1972) (citations omitted). Applying this analysis in the case before it, the court in dictum concluded that "[p]ayments under a proper contract for providing dental education by a church-related university need not be payments `for the benefit of' a religious society or such church-related institution but can be payments for the advancement of the dental health of the citizens of this state." Id. at 333-34, 198 N.W.2d 659. Accord, State ex rel. Warren v. Reuter, 44 Wis.2d 201,170 N.W.2d 790 (1969).
This judicial construction of "for the benefit of" as not barring statutory programs under which the primary effect of the legislation is not the advancement of religion, but a permissible effect such as the advancement of the health of Wisconsin residents, has also been employed to uphold against a challenge under the state constitution a statute that provided for the special educational needs of handicapped children in Wisconsin.State ex rel. Warren v. Nusbaum, 64 Wis.2d 314, 219 N.W.2d 577
(1974). In examining the statute under Wis. Const. art. I, sec.18, the court said the statutory health-oriented effect was secular and the benefit that the religious institution would enjoy as a result of the legislation was merely incidental, and therefore not unconstitutional.
Other forms of publicly funded school aid have also been permitted in Wisconsin. In State ex rel. Reynolds v. Nusbaum,17 Wis.2d 148, 115 N.W.2d 761 (1962), the court held that a statute providing for transportation of parochial school children to the nearest public school they were entitled to attend violated that part of the Wisconsin Constitution that prohibits the expenditure of any public funds "for the benefit of religious societies, or religious or theological seminaries." That constitutional passage was effectively amended, however, by the creation in April, 1967, of Wis. Const. art. I, sec. 23, which provides that: "Nothing in this constitution shall prohibit the legislature from providing for the safety and welfare of children by providing for the transportation of children to and from any parochial or private school or institution of learning." *Page 297 
Other sections of the Wisconsin Constitution also make it clear that the spending prohibition contained in Wis. Const. art. I, sec. 18, is not absolute. Wisconsin Constitution art. I, sec. 24, created in April, 1972, states that nothing in the Wisconsin Constitution bars legislative authorization of "the use of public school buildings by civic, religious or charitable organizations during nonschool hours upon payment by the organization to the school district of reasonable compensation for such use." Wisconsin Constitution art. X, sec. 3, as amended in April, 1972, states that "the legislature by law may, for the purpose of religious instruction outside the district schools, authorize the release of students during regular school hours." Such constitutional amendments "render inappropriate the claim that what was specifically authorized by constitutional amendment offends the document to which the authorization was added," and a challenge to the authorized activity will not be aided by the prohibitions contained in Wis. Const. art. I, sec. 18. State exrel. Holt v. Thompson, 66 Wis.2d 659, 678, 225 N.W.2d 678,688-89 (1975).
The type of school aid contained in 1979 AB 227 is not specifically addressed in the Wisconsin Constitution, however, or in the cases discussed above in Part Il of this opinion. Therefore, further analysis is required to determine whether the bill about which you have inquired is valid under the state constitution.
Statutes are presumed to be constitutional and will be held unconstitutional only when they so appear beyond a reasonable doubt. White House Milk Co. v. Reynolds, 12 Wis.2d 143,106 N.W.2d 441 (1960). A statute will not be held unconstitutional unless the court can say that no state of facts can reasonably be conceived that would sustain it. State v. Texaco, 14 Wis.2d 625,111 N.W.2d 918 (1961). If any state of facts, known or assumed, justifies the law, the court's power to declare a statute unconstitutional is at an end. Questions as to wisdom, need, or appropriateness are for the Legislature. State v. Kerndt,274 Wis. 113, 118, 79 N.W.2d 113, 115 (1956). Additionally, where a constitutional challenge is made to a statute on its face, it is inappropriate to address "the possible [problematic] situations that may arise, each to be `properly evaluated if and when challenges arise.'" State ex rel. Holt v. Thompson,66 Wis.2d 659, 677, 225 N.W.2d 678, 688 (1975). *Page 298 
The search thus must be for any reasonable means of sustaining the statute. Unfortunately, 1979 AB 227 does not contain a legislative declaration of policy. Although such declarations are not determinative, they are given great weight by the courts.State ex rel. Warren v. Nusbaum, 64 Wis.2d 314, 219 N.W.2d 577
(1974). It is reasonable to assume that in introducing this bill the Legislature intended to act in the furtherance of the constitutional mandate of Wis. Const. art. X, sec. 3,[3]
dealing with the establishment of and uniformity of district schools, and directing that such schools shall be free and without charge and that no sectarian instruction shall be allowed. Whereas under the present law local school districts may and do loan textbooks to students attending public schools within the district, this bill would extend that power and in fact require, subject to rules promulgated by the state Superintendent, the loaning without charge of such textbooks to both public and private school pupils within the school district. This calls for the additional cost of this requirement to be at least partially borne by the state, in the form of state aid at the rate of twenty dollars per school year per pupil for whom textbooks are purchased and to whom textbooks are actually loaned. It should be assumed that such a program will be carried out with the same concern for the proper use and return of such loaned textbooks as now exists with respect to pupils in public schools. Under the bill, it is still the school board that designates all the textbooks to be used in the schools under its charge. The newly created sec. 118.03 (2) (a), Stats., would guarantee that none of the textbooks so designated will be sectarian in nature. The provision of rules to be promulgated by the state Superintendent is a further protection required by the bill.
Therefore, applying the previously discussed United States Supreme Court's primary effect test, encompassed in Wis. Const. art. 1, sec. 18 — that is whether the bill would create a law whose primary *Page 299 
effect advances religion — I must assume that the primary legislative purpose is, and the effect would be merely the loaning of certain textbooks to pupils. This result has been upheld elsewhere and described as simply a state's engaging in the legitimate function of "protecting the health of its youth and . . . providing a fertile educational environment for all the school children of the State." Wolman v. Walter, 433 U.S. 229,236. Although another effect of the loaning of such textbooks to pupils of private schools owned or controlled by a religious society could arguably be said to be the advancement of religion because the religious institution would be spared the expense of purchasing those same textbooks for its pupils, it is my conclusion that this would be considered by the Court as just a possible secondary effect, with any benefits that that may accrue to religious organizations being only incidental. See, e.g.,State ex rel. Warren v. Nusbaum, 64 Wis.2d 314, 219 N.W.2d 577
(1974); State ex rel. Warren v. Nusbaum, 55 Wis.2d 316 (1972) (dictum). In my opinion, 1979 AB 227 would thus encounter no barrier under Wis. Const. art. I, sec. 18.
III. Conclusion
It is my opinion that, for the reasons stated in Parts I and II of this opinion, 1979 AB 227, if enacted into law, would violate neither the First Amendment of the United States Constitution nor Wis. Const. art. I, sec. 18.
BCL:JEA:jw
[1] Ohio Rev. Code Ann. sec. 3317.06, as quoted in Wolman,id. at 236-37, authorizes the expenditure of funds:
 (A) To purchase such secular textbooks as have been approved by the superintendent of public instruction for use in public schools in the state and to loan such textbooks to pupils attending nonpublic schools within the district or to their parents. Such loans shall be based upon individual requests submitted by such nonpublic school pupils or parents. Such requests shall be submitted to the local public school district in which the nonpublic school is located. Such individual requests for the loan of textbooks shall, for administrative convenience, be submitted by the nonpublic school pupil or his parent to the nonpublic school which shall prepare and submit collective summaries of the individual requests to the local public school district. As used in this section, "textbook" means any book or book substitute which a pupil uses as a text or text substitute in a particular class or program in the school he regularly attends.
[2] Wisconsin Constitution art. 1, sec. 18, "[f]reedom of worship; liberty of conscience; state religion; public funds," reads as follows:
 The right of every man to worship Almighty God according to the dictates of his own conscience shall never be infringed; nor shall any man be compelled to attend, erect or support any place of worship, or to maintain any ministry against his consent, nor shall any control of or interference with, the rights of conscience be permitted, or any preference be given by law to any religious establishments or modes of worship; nor shall any money be drawn from the treasury [sic.] for the benefit of religious societies, or religious or theological seminaries.
[3] Wisconsin Constitution art. X, sec. 3, "[d]istrict schools, tuition, sectarian instruction; released time," reads as follows:
 The legislature shall provide by law for the establishment of district schools which shall be as nearly uniform as practicable, and such schools shall be free and without charge for tuition to all children between the ages of 4 and 20 years; and no sectarian instruction shall be allowed therein; but the legislature by law may for the purpose of religious instruction outside the district schools authorize the release of students during regular school hours.