STATE EX REL. WISCONSIN HEALTH FACILITIES AUTHOR-
ITY, Petitioner, v. LINDNER, Secretary, Wisconsin
Department of Administration, Respondent.

Supreme Court

*No. 77–895–OA.  Argued January 9, 1979.—Decided June 29, 1979.*
(Also reported in 280 N.W.2d 773.)

For the petitioner there were briefs by *Laurence C. Hammond, Michael J. Spector, O. Thomas Armstrong* and *Quarles & Brady* of Milwaukee, and oral argument by *Mr. Armstrong.*

For the respondent there was a brief by *Earl Munson, Jr., Brady C. Williamson* and *La Follette, Sinykin, Anderson & Munson* of Madison, and oral argument by *Mr. Williamson.*

WILLIAM G. CALLOW, J.   In this original action the Wisconsin Health Facilities Authority (Authority), a statutory mechanism for financing improvements for private, nonprofit health care facilities through the sale

of tax-exempt bonds, seeks a declaration that the Authority's operation is constitutional. The principal issue sought to be resolved involves a determination whether or not the act creating the Authority violates the Establishment Clause of the First Amendment to the United States Constitution or its state constitutional counterpart, Article I, Section 18, of the Wisconsin Constitution. The secretary of the Department of Administration has declined to approve a voucher for $84,500 appropriated by the Wisconsin legislature to fund the functional establishment of the Authority because he concluded Chapter 231, Stats., is unconstitutional. We find the secretary's conclusion to be incorrect.

The legislature created the Authority by Laws of 1973, Chapter 304, as Chapter 231, Stats., effective June 19, 1974. The Act's stated purpose is "to provide assistance and alternative methods of financing to nonprofit health institutions to aid them in providing needed health services consistent with the state's health plan." Sec. 231.-05(1). Because the interest on these bonds is exempt from federal income taxation, the Authority will be able to market the bonds at interest rates below those available through conventional financing sources. The Act contemplates that the Authority will acquire title to the premises upon which which the project will be located. A "project" is defined as "a specific health facility work or improvement to be refinanced, acquired, constructed, enlarged, remodeled, renovated, improved, furnished or equipped, or any combination thereof, by the authority for lease to a participating health institution." Sec. 231.01(4). Upon completion of the project according to the specifications of the health facility, the Authority will lease the project back to the facility for a rental sufficient to cover the principal and interest on the bonds and to pay the project's share of the Authority's administrative expenses. At the end of the lease period, the

Authority may reconvey the project to the facility with or without consideration subject to the condition that it never be used primarily for religious purposes.

The Authority, consisting of seven appointees, may sell tax-exempt bonds and use the proceeds to acquire property for a health facility project and to finance or refinance construction of a project. Authority financing is limited to health institutions, places, or buildings not used primarily for religious activities. Sec. 231.03(8), Stats. The Authority has the power, among other things, to fix and revise rates, rents, fees, and charges for a project's services, and to establish rules for the use of a project. Secs. 231.03(7) and (8). It may designate a participating facility as its agents for various purposes. Secs. 231.03(5) and 231.03(8).

The bonds issued by Authority resolution are payable solely out of Authority revenues. Sec. 231.10(2), Stats. Proceeds from the sale of bonds are deemed trust funds to be used as provided in Chapter 231. Sec. 231.14. The bonds and notes of the Authority are obligations of the Authority alone; the statute specifically disclaims state liability for payment on the bonds. Sec. 231.10(1). The Act contains a pledge that the state will not limit or alter the Authority's rights until its obligations are fully discharged unless the state makes "adequate provision . . . for the protection of the holders of such obligations." Sec. 231.11.

"Health facilities" under sec. 231.01(2), Stats., includes hospitals, nursing homes, nursing schools, clinics, and other medical facilities. To be eligible for Authority financing, a health institution must be a not-for-profit corporation or association. Of the 188 Wisconsin hospitals, three are operated for profit; of the remaining nonprofit hospitals, 50 are religiously affiliated to some degree. These comprised 57 percent of the 16,735 hospital beds in Wisconsin as of July, 1977.

This original action was commenced because the secretary of the Department of Administration refused to honor a voucher for disbursement of $84,500 to the Authority. The refusal to release any of the appropriated monies was grounded on the conclusion that the statute establishing the Authority violates the First Amendment's Establishment Clause and various state constitutional provisions.

## I. THE UNITED STATES CONSTITUTION—THE ESTABLISHMENT CLAUSE

The First Amendment to the United States Constitution provides in part: "Congress shall make no law respecting an establishment of religion, . . . ." This mandate applies equally to state legislatures by virtue of the due process clause of the Fourteenth Amendment. *Cantwell v. Connecticut,* 310 U.S. 296, 303 (1940) ; *Holy Trinity Community School v. Kahl,* 82 Wis.2d 139, 150, 262 N.W.2d 210 (1978). *Everson v. Board of Education,* 330 U.S. 1, 15–16 (1947), was the first Supreme Court decision dealing squarely with the application of the Establishment Clause. The Court upheld a New Jersey law permitting parental reimbursement for the cost of the children's bus transportation to parochial schools. The Court said:

"The 'establishment of religion' clause of the First Amendment means at least this: Neither a state nor the Federal Government can set up a church. Neither can pass laws which aid one religion, aid all religions, or prefer one religion over another. Neither can force nor influence a person to go to or to remain away from church against his will or force him to profess a belief or disbelief in any religion. No person can be punished for entertaining or professing religious beliefs or disbeliefs, for church attendance or non-attendance. No tax in any amount, large or small, can be levied to support any relig-

ious activities or institutions, whatever they may be called, or whatever form they may adopt to teach or practice religion. Neither a state nor the Federal Government can, openly or secretly, participate in the affairs of any religious organizations or groups and *vice versa*. In the words of Jefferson, the clause against establishment of religion by law was intended to erect 'a wall of separation between church and State.' *Reynolds v. United States, supra* at 164." 330 U.S. at 15–16.

The Court with equal vigor noted that, while police and fire protection, sewerage disposal, public highways and sidewalks all contributed to the existence of church schools, prohibition of such services was not the purpose of the First Amendment. The Court said, the purpose of the act was to get children safely to school. The Court spoke of a concern that laws not hamper citizens in their free exercise of religion.

Recently the Court has moved its emphasis from "a wall" of absolute separation between church and state to "a scrupulous neutrality by the State, as among religions":

"Neutrality is what is required. The State must confine itself to secular objectives, and neither advance nor impede religious activity. Of course, that principle is more easily stated than applied. The Court has taken the view that a secular purpose and a facial neutrality may not be enough, if in fact the State is lending direct support to a religious activity. The State may not, for example, pay for what is actually a religious education, even though it purports to be paying for a secular one, and even though it makes its aid available to secular and religious institutions alike. The Court also has taken the view that the State's efforts to perform a secular task, and at the same time avoid aiding in the performance of a religious one, may not lead it into such an intimate relationship with religious authority that it appears either to be sponsoring or to be excessively interfering with that authority."

*Roemer v. Maryland Public Works Board,* 426 U.S. 736, 745–46, 747–48. The Court's resolution of the problem was designed to forestall the evils which the Establishment Clause was designed to protect against: "sponsorship, financial support, and active involvement of the sovereign in religious activity." *Walz v. Tax Commission,* 397 U.S. 664, 668 (1970). The Court has fashioned a three-pronged test to appraise a statute's validity against an Establishment Clause challenge: A. The statute must have a secular legislative purpose; B. Its primary effect must neither advance nor inhibit religion; C. It must not foster excessive governmental entanglement with religion. *Lemon v. Kurtzman,* 403 U.S. 602, 612–13 (1971).[1]

A. *Legislative Purpose*

An increased legislative sophistication in articulating secular intent and a judicial reluctance to question another branch's motives results in the Court according a limited analytic significance to the statute's stated purpose. *See:* Note, *Establishment Clause Analysis of Legislative and Administrative Aid to Religion,* 74 Columbia L. Rev. 1175, 1178–80 (1974). Here the secretary concedes that the Act carries a "wholesome secular purpose" to improve health care delivery by lowering health care costs.[2]

---

[1] The continuing vitality of this test is subject to doubt. A majority of the Court has recently rejected it. *Wolman v. Walter,* 433 U.S. 229 (1977) (Separate Statements of White and Rehnquist, J.J., at 255; Separate Opinions of Brennan, Marshall, and Stevens, J.J., at 255–62, 264–66). Nonetheless, the test is used by a plurality of the Court and remains our best guidance on the application of the Establishment Clause.

[2] Chapter 304, sec. 1, Laws of 1973, states:

"SECTION 1. Legislative declaration. It is hereby determined and declared that for the benefit of the people of this state and the improvement of their health, welfare and living conditions:

(1) It is essential that the people of this state have access to adequate medical care and health facilities;

### B. *Primary Effect*

### 1. *Nature of the Aid*

In determining the primary effect of an act, the Authority argues that the Court has divided the effect into two categories: First, laws providing state grants to institutions with religious affiliation; second, laws benefiting religiously affiliated institutions without any expenditure of state funds. While the nature of the aid may not be entirely irrelevant to Establishment Clause analysis,[3] we do not believe the cases draw the analytic distinction urged by the petitioner. In *Hunt v. McNair,* 413 U.S. 734, 743 (1973), the Court applied its traditional three-step Establishment Clause analysis to the South Carolina Educational Facilities Authority Act which created an entity very similar to the one under consideration here. The authority would issue bonds and

(2) It is essential that health institutions in this state be provided with appropriate additional means to assist in the development and maintenance of public health;

(3) It is the purpose of this act to provide a measure of assistance and alternative methods to enable health institutions in this state to refund or refinance outstanding indebtedness incurred for health facilities and to provide additional facilities and structures which are needed to accomplish the purposes of this act; and

(4) It is the intent of the legislature by the passage of this act:

(a) To create a state authority to lend money to health institutions;

(b) To authorize the state authority to acquire, construct, reconstruct, repair, alter, improve, extend, own, lease and dispose of properties to the end that the state authority may be able to promote the health and welfare of the people of this state;

(c) To vest the state authority with all powers necessary to enable it to accomplish such purpose; and

(d) Not to authorize the state authority to operate any such health facilities."

[3] *E.g.,* the nature of the aid may bear on whether the program at issue "excessively entangles" church and state. *See: Tilton v. Richardson,* 403 U.S. 672, 688 (1971).

make the proceeds available to qualifying colleges to finance a "project." A "project" could not be used for religious activities. The college would convey the project to the authority which would lease it back to the college. At the end of the lease term, the authority would reconvey the project to the college. At issue in *Hunt* was a proposal to finance the construction of dining hall facilities at a Baptist-affiliated college. The form of the aid at issue in *Hunt*—lower cost financing through the issuance of tax-exempt bonds—was identical in all material respects to that at issue here. The Court, in rejecting the contention that the proposal violated the Establishment Clause, did not articulate a separate standard by which to assess the "primary effect" of the aid; rather it focused principally on the nature of the benefited college. The Court in *Hunt* said, "we are satisfied that implementation of the proposal will not have the primary effect of advancing or inhibiting religion," and noted that the New Jersey court had described aid under a similar act as merely being a "governmental service," and the South Carolina court described the role of the state in such assistance as a "mere conduit." *Id.* at 745.

In *Walz v. Tax Commission, supra,* the Court held that property tax exemptions for religious organizations were not violative of the Establishment Clause. The Court observed that the historically rooted tax exemption

". . . creates only a minimal and remote involvement between church and state and far less than taxation of churches. It restricts the fiscal relationship between church and state, and tends to complement and reinforce the desired separation insulating each from the other." 397 U.S. at 676.

The petitioner argues that the lower cost financing made available through the Authority by its sale of tax free bonds is effectively the same as the tax exemption approved in *Walz*. We do not agree. There are significant

differences between this case and *Walz*. First, there is no line of historical precedent to demonstrate that this financing arrangement will not have a detrimental effect on the relationship of church and state. Second, the Act does not restrict the involvement of state government with religion, as did the exemption approved in *Walz*. We conclude *Walz* has no instructive application to this case.

2. *Purpose of the Aided Institutions*

State aid to institutions may have the "primary effect" of advancing religion in the following circumstances: (1) where the aid is granted to an institution so pervasively religious that "a substantial portion of its functions are subsumed in the religious mission"; or (2) where it funds a "specifically religious activity" in an otherwise substantially secular setting. *Hunt,* 413 U.S. at 743.

In *Roemer, supra, Hunt, supra,* and *Tilton v. Richardson,* 403 U.S. 672, 688 (1971), the Court upheld various state programs benefiting church affiliated colleges. In each case the Court found the institutions under consideration not pervasively religious or sectarian. In *Roemer* the Court considered four Catholic-affiliated colleges. The trial court had found that none received funds from or made reports to the Catholic church, though the church was represented on each governing board. There were Catholic chaplains and Catholic services on each campus, but attendance was not required. The mandatory religion or theology courses often taught by Catholic clerics were taught in an " 'atmosphere of intellectual freedom.' " 426 U.S. at 756. Some classes began with prayer, some instructors wore clerical garb, and some classrooms had religious symbols. Faculty hiring was not on a religious basis except for the theology departments. While the great majority of students were Catholic, admissions were not based on religious preference.

In *Hunt* the college at the focus of the controversy was a Baptist college whose trustees were elected by the South Carolina Baptist Convention. The approval of the convention was required for certain financial transactions, and the college charter could be amended only by the convention. The Court nevertheless determined that there was no reason to conclude that the college's operations were "oriented significantly towards sectarian rather than secular education." 413 U.S. at 744.

The profile of the colleges evaluated in *Tilton,* a case involving direct federal grants to four colleges and universities, was very similar to those involved in *Roemer.* In *Tilton* the parties further stipulated that the mandatory theology or religion courses were taught without taint of religious indoctrination. The Court in *Tilton* relied on the "predominant higher education mission" of the colleges to conclude that the colleges were not pervasively sectarian. 403 U.S. at 687. The Court in *Hunt* said:

"Whatever may be its initial appeal, the proposition that the Establishment Clause prohibits any program which in some manner aids an institution with a religious affiliation has consistently been rejected. . . . . Stated another way, the Court has not accepted the recurrent argument that all aid is forbidden because aid to one aspect of an institution frees it to spend its other resources on religious aids." 413 U.S. at 742–43.

In contrast to the *Roemer-Hunt-Tilton* line of decisions involving colleges and universities, the Court has generally held that elementary and secondary schools are pervasively sectarian. *See, e.g., Meek v. Pittenger,* 421 U.S. 349 (1975); *Committee for Public Education v. Nyquist,* 413 U.S. 756 (1973); *Levitt v. Committee for Public Education,* 413 U.S. 472 (1973). The basis of this distinction is the recognition that the very purpose of many elementary and secondary schools is to provide an integrated secular and religious education. The schools

are often devoted to the inculcation of religious values. *Meek*, 421 U.S. at 366.

The parties have discovered no health institution qualifying for financing under the Act with greater religious manifestations than St. Vincent Hospital in Green Bay and have stipulated that it is illustrative of the problem presented. Because the parties agree St. Vincent Hospital in Green Bay is the most manifestly religious of all the hospitals in the state, it is this institution to which the parties turn to measure the constitutionality of the Act. St. Vincent Hospital was established in 1888 by the Hospital Sisters of the Third Order of St. Francis, a Catholic religious order. Its Articles of Incorporation provide that the hospital "shall be connected forever with the Roman Catholic Church and shall be under the supervision and control of said church." The "corporate membership" of the hospital consists solely of members of the Order. The board of directors is appointed by the Order's provincial council and consists solely of members of the Order. The provincial council must approve proposals for all capital expenditures and also the board's selection of a hospital administrator, who is now a non-Catholic lay person. No prospective patient is denied admission or treatment because of religion. None requires formal religious instruction or affiliation as a prerequisite to employment or medical practice privileges. After an initial introductory visit, hospital pastoral services are provided only at patient request. The hospital will assist in finding pastoral services for patients of faiths different than that with which the hospital is affiliated. Any religious symbols in patients' rooms are removed on patient request. Thirty of the 1,500 hospital employees are members of the Order assigned to the hospital under a service contract between the hospital and the Order by which the hospital pays each employee-member's wage directly to the Order.

Hospital administration policy follows directives set forth in a pamphlet titled, "Ethical and Religious Directives for Catholic Health Facilities," published by the United States Catholic Conference and based on Roman Catholic doctrine. The "Directives" generally prohibit procedures, such as abortion and sterilization as a contraceptive measure, "which, according to present knowledge, are recognized as clearly wrong." Members of the medical staff must agree to be bound by the "Directives." One of the mandates of the "Directives" is discussed at compulsory monthly staff meetings.

The Authority argues the mandatory compliance requirements of the hospital "Directives" merely limit the availability of certain procedures, such as nontherapeutic abortion and sterilization, and does not detract from the predominantly secular nature of the health services provided. We find it significant in this determination that public hospitals are not constitutionally required to provide abortion services. *Poelker v. Doe*, 432 U.S. 519 (1977). Recipients of federal Hill-Burton Act funds are not required to perform abortions or sterilizations. *Chrisman v. Sisters of St. Joseph of Peace*, 506 F.2d 308 (9th Cir. 1974). We determine the procedures prohibited by the "Directives" are not so great a part of fundamental health care that their prohibition marks the institution as distinctively religious.

While St. Vincent's bears the indicia of a religious institution, in view of the guideposts established by the United States Supreme Court, we cannot conclude the hospital is distinctly or pervasively sectarian. The determination whether an institution is pervasively religious is to be made with regard to the entire context in which the institution operates. We conclude St. Vincent Hospital resembles the colleges in all material respects far

more closely than it does the lower grade schools. While the hospital is governed by a religious order, the extent of sectarian control seems not significantly greater than that approved by the Court in *Hunt*. The presence of religious symbols, clerical garb, and prayer in classrooms was held not to render the colleges in *Roemer* pervasively religious. Thus the presence of similar religious objects should not render St. Vincent Hospital pervasively religious. We conclude the determinative factor must be the opportunity for and susceptibility to religious indoctrination. St Vincent Hospital must be characterized, like the colleges in *Roemer*, as providing merely the opportunity for the exercise of religious interest. Though a spiritual philosophy may underlie the health care provided, it is not the object of the care.

This conclusion is consistent with the Court's decision in *Bradfield v. Roberts*, 175 U.S. 291 (1889). In that case Congress appropriated $30,000 authorizing the district commissioners to construct two hospital buildings. The buildings were connected with Providence Hospital, a private hospital owned and in charge of Roman Catholic Sisters of Charity incorporated by an act of Congress. The Court upheld the expenditure against an Establishment Clause challenge. The Court refused to go beyond the "legal character of the corporation," as reflected in the act of incorporation.

*Bradfield* was cited in *Hunt* for the proposition that not all programs aiding an institution with religious affiliation are outlawed by the Establishment Clause. We relied upon *Bradfield* and *Hunt* in refusing to go behind the corporate charter and bylaws of a parochial school to determine its religious affiliation. *Holy Trinity Community School v. Kahl, supra* at 154–55.

This Act contains assurances in several respects that the benefits of its financing arrangement will not flow to religious activities in the health care setting. *See:* secs.

231.01(2) and (4), 231.03(8), and 231.07, Stats. Similarly in *Hunt,* the authority's power to aid private colleges and universities extended only to facilities not used for religious purposes. There the lease agreements had to contain clauses forbidding religious use and allowing inspections to enforce the agreement.

■

Because the hospital is not a pervasively religious institution and because the Act insures against benefiting any significant religious activities within the hospital, we determine the Act does not have the primary effect of advancing religion.

C. *Entanglement*

The most difficult question concerns inquiry as to whether the Act fosters excessive entanglement between the state and church. The primary effect analysis considered the substantive question of the role religion plays in the operation of institutions. The entanglement analysis, characterized as "a procedural problem," requires examination of the nature of the required interaction between church and state. *Roemer,* 426 U.S. at 755. The doctrine had its genesis in *Walz v. Tax Commission, supra,* and *Lemon v. Kurtzman, supra,* and has been characterized as having three dimensions:

"First, the doctrine dictates that governmental programs must not have the purpose or effect of advancing or inhibiting religion. Second, it prohibits excessive intermixture of government and religion in the shape of intensive governmental control and surveillance of the activities of religious organizations. Third, it disallows comparable interference by religion with the workings of government." Underwood, *Permissible Entanglement Under the Establishment Clause,* 25 Emory L. J. 17, 17–18 (1976), quoted in *Holy Trinity,* 82 Wis.2d at 150.

■

The Court has developed a three-part test to determine whether the program at issue will result in excessive

entanglement. We must examine (1) the character and purposes of the benefited institutions, (2) the nature of the state aid, and (3) the resulting relationship between the state and the religious authority. In *Roemer,* 426 U.S. at 765, the Court distilled from its earlier cases a fourth criterion: whether the aid will result in political divisiveness. These factors are to be considered cumulatively. *Roemer* at 766.

Because the hospital provides an essentially secular function there is little danger that religion will creep into health care operations, and thus the need for governmental surveillance is reduced *See: Roemer,* 426 U.S. at 762; *Tilton,* 403 U.S. at 687. The parties agree that the form of assistance—providing low-cost financing—is secular and nonideological in nature.

The third part of the test involving the resulting relationship between church and state provokes special concern. In *Hunt* the Court expressed concern for the authority's statutory powers to fix and revise rents and to establish rules for the use of a project:

"These powers are sweeping ones, and were there a realistic likelihood that they would be exercised in their full detail, the entanglement problems with the proposed transaction would not be insignificant." 413 U.S. at 747.

The South Carolina Supreme Court interpreted narrowly the practical effect of these powers: " '[T]he basic function of the Authority is to see . . . that fees are charged sufficient to meet the bond payments.' " *Hunt,* 413 U.S. at 748. The Court concluded that under this language the authority would be called upon to take action against the college only if it defaulted on its rental payments, and this was not sufficient administrative intrusion to result in excessive entanglement between church and state. Because of the substantial similarity, we conclude the rule of *Hunt* can be applied here.

Further considering the entanglement problem, the respondent points out that a "facility" may never be used for religious purposes during and even after the lease term; and therefore, the properties will be subject to substantial policing. The statute does not prescribe or call for continued surveillance following the lease relationship. It simply states that the reconveyance shall provide that the facility financed shall not be put to religious use. In *Tilton, supra,* the Court approved an annual, ongoing relationship wherein the state retained the right to inspect subsidized buildings for sectarian use. *See also: Roemer,* 426 U.S. at 763–64.

We conclude on the basis of the language of the Act and the Court's precedents that the resulting relationship of the state and the religious institutions is not excessively entangling.

We must examine the Act to see that its administration is not likely to result in political divisiveness. The respondent argues that potential competition among hospitals would generate political controversy and would invite charges of religious discrimination where a non-religiously aligned hospital was aided in preference to a religiously aligned hospital or one denomination was favored over another denomination. In *Roemer,* the Court found no fatal potential for political divisiveness where more than two-thirds of the recipient colleges had no religious affiliation. By contrast in *Nyquist,* where the Court found the program politically divisive, the recipient schools were 95 percent Catholic. The percentage of religiously affiliated institutions eligible for financing under the Act does not approach that in the elementary and secondary school cases in which the Court has cited the high number of religiously affiliated recipients. Here the potential competition for the limited funds is more allied with *Roemer,* and we do not find that degree of

potential divisiveness sufficient to overcome the presumption of constitutionality.

We conclude that on this record the Act does not violate the Establishment Clause of the First Amendment.

## II. ARTICLE I, SECTION 18, OF THE WISCONSIN CONSTITUTION

Article I, Section 18, of the Wisconsin Constitution, provides:

> *"Freedom of worship; liberty of conscience; state religion; public funds.* Section 18. The right of every man to worship Almighty God according to the dictates of his own conscience shall never be infringed; nor shall any man be compelled to attend, erect or support any place of worship, or to maintain any ministry, against his consent; nor shall any control of, or interference with, the rights of conscience be permitted, or any preference be given by law to any religious establishments or modes of worship; nor shall any money be drawn from the treasury for the benefit of religious societies, or religious or theological seminaries."

This court has remarked that the language of Article I, Section 18, while "more specific than the terser" clauses of the First Amendment, carries the same import: Both provisions " 'are intended and operate to serve the same dual purpose of prohibiting the "establishment" of religion and protecting the "free exercise" of religion . . .' " *State ex rel. Holt v. Thompson,* 66 Wis.2d 659, 676, 225 N.W.2d 678 (1975); quoting from *State ex rel. Warren v. Nusbaum,* 55 Wis.2d 316, 332, 198 N.W.2d 650 (1972). In *State ex rel. Warren v. Reuter,* 44 Wis.2d 201, 227, 170 N.W.2d 790 (1969), we stated that the additional language "nor shall any money be drawn from the treasury for the benefit of religious societies" renders the clause more prohibitive than the First Amendment,

but not "so prohibitive as not to encompass the primary-effect test." In *Nusbaum*, 55 Wis.2d at 333, quoting from *Tilton*, 403 U.S. at 679, we said:

" '[t]he crucial question [is] not whether some benefit accrues to a religious institution as a consequence of the legislative program, but whether its principal or primary effect advances religion.' "

We conclude that under the primary-effect test the aid does not advance religion; instead, it flows to the predominantly secular aspects of health care and is not violative of Article I, Section 18, of the Wisconsin Constitution.

## III.   OTHER CONSTITUTIONAL PROVISIONS

The respondent raises a variety of constitutional objections to the Act, most of which he candidly acknowledges were settled adversely to his position in *Wisconsin Solid Waste Recycling Authority v. Earl*, 70 Wis.2d 464, 235 N.W.2d 648 (1975), and *State ex rel. Warren v. Nusbaum*, 59 Wis.2d 391, 208 N.W.2d 780 (1973). The burden is on the respondent to establish the asserted constitutional infirmities beyond a reasonable doubt. *State ex rel. Hammermill Paper Co. v. La Plante*, 58 Wis.2d 32, 46–47, 205 N.W.2d 784 (1973). The determinations of *Nusbaum* and *Earl* as they decided the questions of (1) expenditure of public funds for public purposes, (2) indirect financing, (3) pledge of credit and creation of debt, (4) works of internal improvement, (5) unreasonable exemption from taxation, (6) payment of state funds, special or private law, (7) delegation of legislative authority, (8) equal protection, and (9) reserved power to repeal are persuasive authority for us to summarily dismiss these additional challenges to the constitutionality of the Act.

*By the Court.*—Chapter 231, Laws of 1973, is valid and constitutional; and respondent is ordered to honor the voucher of the Authority.

ABRAHAMSON, J., took no part.