Donald E. Percy, Secretary Department of Health and SocialServices
You ask two basic questions concerning the licensure of Community Based Residential Facilities (CBRFs) which are owned and operated by religious organizations. You also ask whether certain facilities owned and operated by the Salvation Army are subject to licensure and regulation under ch. 50, Stats., and chapter HSS 3 Wis. Adm. Code. Your two basic questions may be stated as follows:
 1. When are facilities owned and operated by religious organizations exempt from licensure and regulation under ch. 50, Stats., and chapter HSS 3 Wis. Adm. Code because service is provided only to a religiously-oriented clientele?
It is my opinion that licensure is required unless the facility is a convent, monastery or similar place where residents are all members of a religious hierarchy living in seclusion and operating under a set of religious vows or rules.
 2. Can the Department Health Social Services constitutionally require facilities operated by religious organizations *Page 113 
not exempt under sec. 50.01(1), Stats., or sec. 50.03(9), Stats., to be licensed and regulated under ch. 50, Stats., and chapter HSS 3 Wis. Adm. Code?
In my opinion, the answer is yes.
I
SCOPE OF STATUTORY EXEMPTION
Under sec. 50.01(1), Stats., "[t]he reception and care or treatment of a person in a convent or facility owned or operated exclusively by and for members of a religious order shall not constitute the premises to be a `community-based residential facility.'"
Terms such as "convent" and "members of a religious order" are to be construed according to "common and approved usage." Sec.990.01, Stats.; Midtown Church of Christ v. City of Racine,83 Wis.2d 72, 76, 264 N.W.2d 281 (1978).
A "convent" is defined as "an association or community of recluses devoted to a religious life under a superior: a body of monks, friars or nuns constituting one local community — now usu. restricted to a convent of nuns . . . ." Webster's ThirdNew International Dictionary 498 (1976). In Midtown, the court noted that the same dictionary at 1587 defines "order" as "a religious body, typically an aggregate of separate communities living under a distinctive rule, discipline, or constitution: a monastic brotherhood or society . . . ." 83 Wis.2d at 76. "Monastic," in turn, is defined as, "secluded from temporal concerns and devoted to religion." Webster's Third NewInternational Dictionary 1457 (1976). Under statutes such as sec.50.01(1), Stats., the term "members of a religious order" is not broad enough to encompass all employes or members of a particular religious organization. See Eighth Street Baptist Church, Inc. v.United States, 295 F. Supp. 1400 (D. Kan. 1969), aff'd on othergrounds, 431 F.2d 1193 (10th Cir. 1970); Midtown.
Because of the similarities in their respective dictionary definitions, the terms "convent" and "facility owned and operated exclusively by and for members of a religious order," should be construed in pari materia. I therefore conclude that the statutory exemption is limited to convents, monasteries and similar facilities where members of a religious hierarchy live in seclusion, operating under a set of *Page 114 
religious vows or rules. When such an exemption is not available, licensure is required under sec. 50.03(1), Stats.
II
CONSTITUTIONAL ISSUES
The first amendment to the United States Constitution provides: "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof." This provision applies to the states by virtue of the due process clause of the fourteenth amendment. Cantwell v. State ofConnecticut, 310 U.S. 296, 303 (1940). Wisconsin Constitution art. I, § 18 provides:
 The right of every man to worship Almighty God according to the dictates of his own conscience shall never be infringed; nor shall any man be compelled to attend, erect or support any place of worship, or to maintain any ministry, against his consent; nor shall any control of, or interference with, the rights of conscience be permitted, or any preference be given by law to any religious establishments or modes of worship . . . .
These federal and state constitutional provisions carry the same impact. Both provisions "`"are intended and operate to serve the same dual purpose of prohibiting the `establishment' of religion and protecting the `free exercise' of religion."'" State ex rel.Wis. Health Fac. Auth. v. Lindner, 91 Wis.2d 145, 163,280 N.W.2d 773 (1979).
A constitutional analysis requires that every presumption be indulged to sustain a statute or rule when it is attacked. Wis.Bingo Sup. Equip. Co. v. Bingo Control Bd., 88 Wis.2d 293,301, 276 N.W.2d 716, 719 (1979).
A. Free Exercise of Religious Beliefs.
Chapter 50, Stats., exempts care provided by facilities to residents who are religiously opposed to conventional medical treatment and entirely exempts those facilities in which members of a religious hierarchy have sincere religious beliefs in being cloistered from society. These two exemptions eliminate the possibility of free exercise issues in such situations.
The free exercise of religion is not violated if (1) the statute does not deny the free exercise of religious belief or, if so, (2) a state interest *Page 115 
of sufficient magnitude overrides the legitimate private interest invoking the protection of the free exercise clause. Wisconsin v.Yoder, 406 U.S. 205, 214 (1972).
1. Infringement On The Exercise Of Religious Beliefs.
The Supreme Court has held that an indirect financial or regulatory burden does not infringe upon the free exercise of religion. "To strike down, without the most critical scrutiny, legislation which imposes only an indirect burden on the exercise of religion, i.e., legislation which does not make unlawful the religious practice itself, would radically restrict the operating latitude of the legislature." Braunfeld v. Brown, 366 U.S. 599,606 (1961).
Similar considerations apply with regard to licensure and regulation. A free exercise claim can succeed in such a context only if it is established that the statute suppresses the exercise of sincere religious beliefs or the dissemination of religious views, as opposed to regulating the manner in which secular activities are conducted. Compare Murdock v.Pennsylvania, 319 U.S. 105 (1941); Follett v. Town of McCormick
S.C., 321 U.S. 573 (1944); with Cox v. State of New Hampshire,312 U.S. 569 (1941); Washburn v. Ellquist, 242 Wis. 609,9 N.W.2d 121, reh. denied 10 N.W.2d 292 (1943); State v. King ColonyRanch, 137 Mont. 145, 350 P.2d 841, cert. denied 364 U.S. 817
(1960). Courts employing this dichotomy have held that the free exercise clause is not implicated in the licensure and regulation of facilities such as day care centers. Roloff EvangelisticEnterprises v. State, 556 S.W.2d 856 (Tex.Civ.App. 1977), writref. n.r.e., appeal dismissed, 439 U.S. 803, reh. denied 439 U.S. 998
(1978). Also see State v. Fayetteville Street ChristianSchool, 42 N.C. App. 665, 258 S.E.2d 459, 464 (1979), vacated andremanded on other grounds 299 N.C. 351, 261 S.E.2d 908, on reh.,299 N.C. 731, 265 S.E.2d 387 (1980). Unless different considerations apply to CBRFs, no free exercise claim can arise in the context of ch. 50, Stats., and chapter HSS 3 Wis. Adm. Code.
The requirements of ch. 50, Stats., and chapter HSS 3 Wis. Adm. Code, are secular in nature and, except in unusual circumstances, do not appear to have any effect whatsoever on the exercise or dissemination of religious beliefs. Chapter 50, Stats., contains relatively few requirements that are applicable to CBRFs. Sections 50.03(5m) and 50.05, Stats., permit the Department to remove residents or to place *Page 116 
a monitor in a facility when there is an emergency or when the facility is operating without a valid license. Chapter HSS 3 Wis. Adm. Code contains more detailed requirements. Subchapter II of chapter HSS 3 Wis. Adm. Code sets certain requirements for the administrative management of CBRFs. Certain assurance of responsibility is required. Section HSS 3.11 Wis. Adm. Code. Personnel records and written personnel policies are required. Section HSS 3.13 Wis. Adm. Code. A written statement of the programs to be offered and the individuals to be served is mandated. Section HSS 3.12 Wis. Adm. Code. There must be an admission agreement, written records concerning residents and written notice to certain parties when there are significant changes in the condition of residents. Sections HSS 3.14-HSS 3.16 Wis. Adm. Code. Certain types of services must be offered and there must be an individual service plan for each resident. Sections HSS 3.21-HSS 3.23, HSS 3.61 Wis. Adm. Code. The individual rights of residents must be explained to them and a written complaint procedure must be instituted. Section HSS 3.31 Wis. Adm. Code. Finally, there are detailed construction, sanitation and health requirements, which are commonly called "health-safety code" requirements. See sections HSS 3.23(4), (5), HSS 3.24, HSS 3.49-HSS 3.57, HSS 3.62-HSS 3.65 Wis. Adm. Code. Any of these administrative code provisions may be waived under the conditions specified in section HSS 3.08(7) Wis. Adm. Code.
In order to trigger the free exercise protections of the state and federal constitutions, it must either be shown that these licensure and regulatory provisions prohibit the exercise of sincere religious beliefs or place a direct financial or regulatory burden upon a practice mandated by a particular religion. It might be possible for a religious organization to make such a preliminary showing if the tenets of that organization mandate the operation of CBRFs and (1) the religious tenets of the organization prohibit the provision of some kinds of care mandated by ch. 50, Stats., and chapter HSS 3 Wis. Adm. Code, (2) the religious tenets of the organization require the provision of the kinds of care mandated by ch. 50, Stats., and chapter HSS 3 Wis. Adm. Code in some other manner than that specified in those chapters or (3) the religious tenets of the organization require the provision of the kinds of care mandated by ch. 50, Stats., and chapter HSS 3 Wis. Adm. Code but prohibit licensure by the state. *Page 117 
When no statutory exemption is available to such an organization, the state's interest in regulating CBRFs would have to be examined.
2. State's Interest In Regulating CBRFs.
A number of courts have held that a state has a compelling interest in licensing and regulating day care facilities for minors. Fayetteville Street Christian School, 258 S.E.2d at 463;State, Etc. v. Heart Ministries, Inc., 227 Kan. 244, 607 P.2d 1102,appeal dismissed, 449 U.S. 802 (1980). In Heart Ministries,Inc., the Supreme Court of Kansas distinguished Wisconsin v.Yoder, 406 U.S. 205 (1972), a case in which it was held to be contrary to the sincere religious beliefs of the Amish to attend high school:
 The compelling interest of the State, as parens patriae, is the protection of its children from hunger, cold, cruelty, neglect, degradation, and inhumanity in all its forms. To fulfill this responsibility, the legislature has elected to impose licensing and inspection requirements. To these requirements the defendants' free exercise rights must bow; the balance weighs heavily in favor of those unfortunate children whom the State must protect.
607 P.2d at 1112.
The purpose of the CBRF regulatory scheme is contained in sec.50.02(2)(a), Stats., which provides:
 The department, by rule, shall develop, establish and enforce regulations and standards for the care, treatment, health, safety, rights, welfare and comfort of residents in community-based residential facilities and nursing homes and for the construction, general hygiene, maintenance and operation of those facilities which, in the light of advancing knowledge, will promote safe and adequate accommodation, care and treatment of residents in those facilities; and promulgate and enforce rules consistent with this section.
Such public health and safety considerations override any claim that the licensing process itself infringes upon any religious belief or practice. Cf., Johnson v. Motor Vehicle Division,197 Colo. 455, 593 P.2d 1363 (1979). Compare Roloff,556 S.W.2d at 856-57. It is also *Page 118 
generally held that even when the motivation for operating a facility is religious, the facility still must be in compliance with all zoning, building code and health regulations. See, e.g.,Damascas Community Church v. Clackamas Cty., 45 Or. App. 1065,610 P.2d 273 (1980). I therefore conclude that the "health-safety code" provisions contained in chapter HSS 3 Wis. Adm. Code may constitutionally be applied to any facility operated by a religious organization.
In this state, CBRFs serve individuals "unable to live independently in the community." Section HSS 3.04(2)(a) Wis. Adm. Code. The CBRF regulations afford protection to adults and children for reasons similar to those advanced by the State of Kansas for promulgating its day care regulations. Like most minors, adult residents of CBRFs are unable to provide for certain of their own needs. The state has just as compelling an interest in the protection of needy adults as it does in the protection of needy children. That interest is sufficient to override any interest a religious organization may have in being exempt from regulation.
There is an additional reason why the state's interest in regulating these facilities outweighs any constitutional claim for exemption. A number of religious organizations operate nursing homes and/or CBRFs. The rehabilitation of individuals with identifiable, treatable, physical or social handicaps is, in the common understanding, a secular activity. Ordinarily, a religious organization which purports to ritualize such secular activities enjoys no special constitutional protection as against those religions that do not purport to do so. See Heffron v.International Society for Krishna Consciousness, Inc., 451 U.S. 904
(1981); Heart Ministries, Inc.; Gospel Army v. City of LosAngeles, 27 Cal. 2d 232, 163 P.2d 704, 711, appeal dismissed,331 U.S. 543 (1945).
The requirements concerning CBRFs which are contained in subch. 1 of ch. 50, Stats., and chapter HSS 3 Wis. Adm. Code, do not violate the free exercise clause of the first amendment or the corresponding provisions contained in Wis. Const. art. I, §18.
B. Establishment of Religion.
The United States Supreme Court has, in recent years, moved away from a mechanistic "no-aid-to-religion" approach to the establishment clause and has promulgated a three-part test to determine *Page 119 
the constitutionality of statutes which benefit particular religious groups. See Lemon v. Kurtzman, 403 U.S. 602 (1971);Committee for Public Ed. and Religious Lib. v. Nyquist, 413 U.S. 756,772-73 (1973). Under the modern test, the statute must serve a secular legislative purpose, must have a "primary effect" that neither advances nor inhibits religion and must avoid excessive entanglement by the state with religion. Walz v. Tax Commissionof City of New York, 397 U.S. 664 (1970). The Wisconsin Supreme Court has applied similar tests to Wis. Const. art. I, § 18.State ex rel. Wis. Health Fac. Auth. v. Lindner, 91 Wis.2d 145,152, 280 N.W.2d 773, 777 (1979).
In Walz, the Supreme Court upheld property tax exemptions for real estate owned by entities operated exclusively for religious purposes, using the following language:
 The legislative purpose of a property tax exemption is neither the advancement nor the inhibition of religion, it is neither sponsorship nor hostility. New York, in common with the other States, has determined that certain entities that exist in a harmonious relationship to the community at large, and that fosters its "moral or mental improvement" should not be inhibited in their activities by property taxation.
. . . .
 Granting tax exemptions to churches necessarily operates to afford an indirect economic benefit and also gives rise to some, but yet a lesser, involvement than taxing them.
. . . .
 The grant of a tax exemption is not sponsorship since the government does not transfer part of its revenue to churches, but simply abstains from demanding that the church support the state.
397 U.S. at 672, 674-75.
The same considerations apply to exemptions from licensure and regulation afforded to religious groups. Such exemptions, in and of themselves, do not advance religion. Just as the State of Wisconsin may tax or choose to exempt the property on which CBRFs operated by religious organizations is located, the State of Wisconsin may choose to regulate or exempt CBRFs operated by religious organizations. Under the rationale of Walz, almost any regulatory exemption *Page 120 
avoids excessive entanglement with, and does not inhibit, religion by reducing church-state interaction to a minimum. When a statutory exemption from regulation is afforded to a religious organization, the major consideration is whether the exemption serves a secular purpose.
Exemptions from regulation and/or licensure are potentially available to any religious organization under secs. 50.01(1) and50.03(9), Stats. Section 50.01(1), Stats., provides in part: "The reception and care or treatment of a person in a convent or facility owned or operated exclusively by and for members of a religious order shall not constitute the premises to be a `community-based residential facility.'"
Section 50.03(9), Stats., provides:
 Nothing in this section shall be so construed as to give authority to supervise or regulate or control the remedial care or treatment of individual patients who are adherents of a church or religious denomination which subscribes to the act of healing by prayer and the principles of which are opposed to medical treatment and who are residents in any facility operated by a member or members, or by an association or corporation composed of members of such church or religious denomination, if the facility admits only adherents of such church or denomination and is so designated; nor shall the existence of any of the above conditions alone militate against the licensing of such a home or institution. Such facility shall comply with all rules and regulations relating to sanitation and safety of the premises and be subject to inspection thereof. Nothing in this subsection shall modify or repeal any laws, rules and regulations governing the control of communicable diseases.
As the emphasized language indicates, sec. 50.03(9), Stats., does not provide a total exemption from regulation or licensure. Instead, the statute exempts from regulation only "the remedial care or treatment of individual patients who . . . subscribe to the act of healing by prayer and . . . are opposed to medical treatment . . . ." Among other things, ch. 50, Stats., seeks to protect the individual rights of residents in those facilities which are subject to licensure. Sec. 50.09, Stats. Residents retain the right to meet with religious groups and participate in religious activities, i.e., to practice their religion, unless *Page 121 
medically contraindicated. Sec. 50.09(1)(h), Stats. In a facility where all of the residents believe in healing by prayer as opposed to conventional medical treatment, the religious beliefs of residents will necessarily come in conflict with the dictates of conventional medical practice. Section 50.03(9), Stats., strikes a balance in favor of the preservation of such religious beliefs, unless they would lead to the spread of communicable disease. Even though the statute provides a partial exemption only for care provided to those holding certain religious beliefs, that exemption is carefully tailored so that only the process of healing by prayer is exempt from regulation. The failure to provide such an exemption would present a complex free exercise problem as to whether a state's interest in preserving public health may override a sincere religious belief in refusing medical treatment. Similar considerations underlie the exemption contained in sec. 50.01(1), Stats. That statute avoids the necessity of making a determination as to when the state's interest in preserving public health overrides a sincere religious belief in being cloistered from society. Both secs.50.01(1) and 50.03(9), Stats., serve a secular legislative purpose by protecting the free exercise of sincere religious beliefs.
Neither sec. 50.01(1), Stats., nor sec. 50.03(9), Stats., violates the establishment clause. The regulatory scheme of licensure and regulation contained in subch. I of ch. 50, Stats., and chapter HSS 3 Wis. Adm. Code, does not violate the free exercise clause. That regulatory scheme of licensure and regulation also does not contravene Wis. Const. art. I, § 18. I therefore conclude that the answer to your second question is yes.
III
 APPLICATION OF CBRF REGULATIONS TO FACILITIES OPERATED BY THE SALVATION ARMY
A. Availability of Exemption.
The Salvation Army is a religious organization. See McClure v.Salvation Army, 323 F. Supp. 1100 (N.D. Ga. 1971), aff'd,460 F.2d 553 (5th Cir. 1972), cert. denied, 409 U.S. 896, reh.denied, 409 U.S. 1050. The function of the Salvation Army, which was founded by General William Booth in 1865, has been broadly described as "to evangelize the masses." In Wisconsin, the Salvation Army may incorporate as "a charitable, educational, missionary, philanthropic, *Page 122 
beneficial and religious organization." Sec. 187.16(1), Stats. This statute recognizes the broad range of the Salvation Army's functions: "The corps is also called upon to do many things outside of its preaching ministry. There is a regular program for the visitation of homes. Food is provided to the needy and referrals of the sick are made to doctors and hospitals and other charitable functions." McClure, 323 F. Supp. at 1101.
Salvation Army soldiers constitute the laity of that organization, while Salvation Army officers comprise the religious hierarchy of the organization. McClure,323 F. Supp. at 1102. Accordingly, the statutory exemption contained in sec.51.01, Stats., is available to any facility operated exclusively by and for officers living apart from society pursuant to the tenets of the Salvation Army.
 B. Applicability of CBRF Regulations To Adult Rehabilitation Centers.
One of your specific concerns is whether the Salvation Army's adult rehabilitation centers are subject to licensure and regulation as CBRFs. Those facilities which are not equivalent to convents or monasteries are subject to licensure or regulation if they are "place[s] where 3 or more unrelated adults reside in which care, treatment or services above the level of room and board but not including nursing care are provided to persons residing in the facility as a primary function of the facility." Sec. 50.01(1), Stats.
Under section HSS 3.04(2)(b) Wis. Adm. Code, any facility which serves three or more adults and is operated by a corporation meets the numerical criteria of sec. 50.01. Stats.
A facility must also provide "care, treatment or services above the level of room and board." Examples are provided in section HSS 3.04(2)(a) Wis. Adm. Code:
 1. Information and referral. 2. Leisure time services. 3. Vocational services. 4. Transitional services. 5. Supportive home care services. 6. Prescribed personal care services. *Page 123 
7. Health monitoring and arrangement for health-related services. 8. Counseling services.
Publications prepared by the Salvation Army indicate that such services are provided at the centers. A summary sheet prepared by the Salvation Army Men's Social Services Department (U.S.A.) indicates that centers provide "in-residence treatment, diagnostic services, work therapy, residential care, after care, information and referral services . . . within a Christian atmosphere and philosophy." The summary sheet goes on to state that the services offered by such centers include "therapeutic community, individual and group counseling; work therapy; recreational therapy; social rehabilitation; in-service education in substance abuse; Christian Services and counseling; medical assistance; referral or detoxification services."
The centers are operated pursuant to a handbook, The SalvationArmy Men's Social Service Handbook of Standards, Principles andPolicies (hereinafter, "Handbook"), which is subject to continual revision. The service program in effect at the centers is comprised of five major approaches. The spiritual approach consists of such items as chapel services, devotions, Bible classes, vesper services, religious films and spiritual counseling (Handbook, 9:5:1-9:5:5). The leisure time approach attempts to channel the activities of residents in a "positive" fashion through organized and undirected activities (Handbook, 9:11:1-9:11:5). The medical approach consists of trying to satisfy all of the medical needs of center residents (Handbook, 9:13:1-9:13:7). The group approach consists of all group activities (Handbook, 9:9:1). While some of these activities, such as Bible classes are "spiritual," the vast majority are not. These other activities include such things as orientation meetings, Alcoholics Anonymous, fellowship clubs, group therapy and psychotherapy and discussion groups (Handbook, 9:9:1). The casework approach is distinct from the spiritual approach but encompasses, to some degree, all of the other approaches. As part of this approach, a caseworker is assigned and attempts both to serve and to track the progress of the resident (Handbook, 9:7:1-9:7:7). The caseworker attempts to use casework techniques whenever possible. Casework activities include intake, follow-up, interviewing and counseling, case planning and case recording (Handbook, 9:7:2). The summary sheet and Handbook indicate that, with the possible exception of prescribed personal care *Page 124 
services, the centers offer all of the services enumerated in section HSS 3.04(2)(a) Wis. Adm. Code. See, e.g., section HSS 3.05(17), (31), (34) Wis. Adm. Code.
Section 50.01(1), Stats., also requires that such services be provided "as a primary function of the facility." This occurs whenever "[t]he facility provides the service to a resident who has health, safety, or personal welfare related needs which make the resident unable to live in a residential setting in which the service is not provided." Section HSS 3.04(2)(c)1. Wis. Adm. Code. In order for a facility to be exempt from regulation, the individuals residing within it must be capable of arranging for all of their health, safety and personal welfare needs. The centers, however, admit only homeless and unattached adult males with identifiable, treatable social handicaps (Handbook, 1:1:4). The typical center resident is undersocialized, a 5 heavy drinker and a very dependent person (Handbook, 7:3:1-7:3:4; 9:1:1). Services are also provided to the mildly drug addicted, the emotionally unstable, vagrants and individuals released from mental or correctional institutions (Handbook, 7:5:2). Such individuals generally cannot arrange for the services offered by the centers. That is why they seek admission. A primary function of the centers is the provision of supportive services to these individuals. Also see Handbook, 1:1:4.
The centers meet all three criteria contained in sec. 51.01, Stats. Section 51.03, Stats., and chapter H 3 Wis. Adm. Code therefore require that they be licensed as CBRFs.
 C. Constitutional Issues With Respect To Adult Rehabilitation Centers.*
1. Free Exercise of Religious Beliefs.
When the Salvation Army was founded, the concept of performing social work did not even exist. General Booth later determined *Page 125 
that "attention to other than spiritual needs . . . was necessaryto make his evangelism effective" (Handbook 1:1:1) (emphasis supplied). The concept of the adult rehabilitation center did not evolve until long after the development of the social work concept (Handbook 1:1:11: 1:3). The Handbook recognizes the distinction between social work and evangelism, referring to the operation of adult rehabilitation centers as "socio-spiritual service" (Handbook 3:1:2).
This "social-spiritual" service has one overriding goal:
 If one of the prime objectives of the treatment program is to retain the beneficiary on a temporary basis only, carrying through treatment until he has successfully conquered his handicaps, then the carrying out of an organized process, called "graduation," is the logical culmination.
. . . .
 . . . [T]he term "graduation," . . . applie[s] to the man who moves from the beneficiary status to the employee status. This may involve leaving the center to an outside job, or may, according to the needs of the center and also the needs and desires of the man, mean a continuation in the center as an employee.
(Handbook, 9:15:1). Such a goal does not require that each and every resident become a soldier in the Salvation Army; tolerance of the religious views of residents is required (Handbook, 7:9:2-7:9:3). The requirements concerning CBRFs which are contained in ch. 50. Stats., and chapter HSS 3 Wis. Adm. Code. do not attempt to regulate the spiritual aspect of the Salvation Army's "socio-spiritual service."
There is no indication that the Salvation Army must operate CBRFs. Even if such evidence did exist, the historical background concerning the establishment of the centers does not suggest that compliance with detailed health-safety code requirements and various administrative and record-keeping requirements is contrary to the sincere religious beliefs of the Salvation Army. Since there is no evidence that it is contrary to the religious beliefs of the Salvation *Page 126 
Army to comply with CBRF regulations, the protective provisions contained in the free exercise clause of the first amendment and Wis. Const. art. I, § 18, are not triggered. Even if such provisions could be invoked, I have already concluded that the state has a compelling interest in regulating all CBRFs. No special characteristics of the centers require alteration of that analysis.
2. Establishment of Religion.
The Supreme Court has recently indicated that a challenge to a regulation on establishment clause grounds poses difficult questions of standing. See Valley Forge Christian College v.Americans United For Separation of Church and State, Inc.,102 S. Ct. 752 (1982).
The only provisions of ch. 50, Stats., which even arguably require an establishment clause analysis are sec. 50.01(1), Stats., which exempts convents, monasteries and similar facilities, and sec. 50.03(9), Stats., which exempts care provided to individuals opposed to conventional medical treatment. There is no indication that the two statutory exemptions are underinclusive, i.e., that nonexempt care or treatment is provided by the Salvation Army in circumstances similar to those where the statutory exemptions can be claimed by other religious organizations. Consequently, it is doubtful if the Salvation Army has standing to challenge these exemptions. I have already concluded that the licensing and regulation of CBRFs under ch. 50, Stats., and chapter HSS 3 Wis. Adm. Code is constitutional. Therefore, even if the standing barrier could be overcome and an establishment clause claim successfully asserted, the result would be the elimination of the two statutory exemptions rather than the creation of a blanket exemption for all CBRFs operated by religious organizations. Cf. State ex rel.Briggs Stratton v. Noll, 100 Wis.2d 650, 658-59,302 N.W.2d 487 (1981).
I therefore conclude that adult rehabilitation centers operated by the Salvation Army are subject to licensure and regulation under ch. 50, Stats., and chapter HSS 3 Wis. Adm. Code.
BCL:FTC
* In information provided to this office, you emphasize that the Salvation Army formerly operated a child welfare institution which was licensed and funded by the state pursuant to secs. 46.032, 48.66 and 48.67, Stats. You also indicate that, although the application was later withdrawn, the Salvation Army has requested CBRF licensure for a facility which serves ambulatory or semi-ambulatory aged and mentally impaired individuals. While such actions do not constitute a waiver of a constitutional claim for exemption from regulation, they might be considered by a court as diminishing the weight or credibility of a claim that CBRF regulation infringes upon the exercise of sincere religious beliefs by the Salvation Army. *Page 127